2009 Ark. App. 606

**Robert FRIEND and Jennifer Turner, Appellants,**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES,**
Appellee.

**No. CA 09–310.**

Court of Appeals of Arkansas.

Sept. 23, 2009.

Leah Lanford, Little Rock, for appellant.

Tabitha Baertels McNulty, Office of Chief Counsel, Little Rock, for appellee.

M. MICHAEL KINARD, Judge.

Jennifer Turner and Robert Friend have appealed from an order of the Garland County Circuit Court terminating their parental rights to A.F., who was born April 7, 2006. Because the circuit court's findings supporting termination are not clearly erroneous, we affirm the circuit court's decision as to both parents.

This case involved intensive DHS evaluation and many hearings over a span of nearly eighteen months, culminating in a termination order being entered December 31, 2008. A thorough recitation of the facts is appropriate because of the heavy burden applicable to termination-of-parental-rights cases and the deferential standard of review employed by the appellate court. On July 2, 2007, while A.F. was with appellants, their car |₂broke down on Highway 7, north of Dover, Arkansas. The police arrested Jennifer for public intoxication; they also arrested Robert because he had outstanding felony warrants in Colorado. DHS placed a seventy-two-hour hold on A.F. and filed a petition for emergency custody. The circuit court granted the petition and held a probable-cause hearing on July 17, 2007, which Jennifer attended with her attorney. Robert was incarcerated and did not attend. The court found probable cause and gave Jennifer supervised visitation. It directed her to undergo a psychological evaluation, to receive individual counseling, and to complete an inpatient program that she was currently attending. It also ordered her to obtain and maintain stable housing and employment.

The court held the adjudication hearing on August 23, 2007. Jennifer, but not Robert, attended. The court found A.F. dependent-neglected and set a goal of reunification. It continued supervised visitation with Jennifer and ordered DHS to assist her in entering an inpatient drug-treatment program that allowed children to be placed with their mothers. It stated that, if she failed to comply with the facility's rules or left the facility, A.F. would be immediately returned to foster care. The court directed Jennifer to take the same actions as before, to remain clean and sober, to prove stable housing and employment, to complete parenting classes, and to contact her caseworker on a weekly basis. The court noted that Robert was incarcer-

ated in Colorado and ordered him to follow the case plan upon his release, if interested. The court also ordered the parties to enter into mediation. On September 11, 2007, Jennifer, the guardian ad litem, and DHS signed an agreement |₃containing a provision barring Robert from contacting Jennifer and A.F. Robert's attorney would not agree to this and withdrew from mediation. The court adopted the agreement.

The court held a review hearing on November 2, 2007. It found that DHS had made reasonable efforts to provide reunification services and that Jennifer had not complied with the case plan or court orders. The court continued the goal of reunification and kept Jennifer's and Robert's responsibilities the same as before, adding that they must prove their compliance. Robert wrote the court clerk on January 14, 2008, asking to be notified of all proceedings in this case. His attorney sent him copies of all the pleadings on February 5, 2008. Robert asked his attorney to request a continuance of a hearing scheduled for February 21, 2008, so he could be there.

The court held a review hearing on February 21, 2008, which Jennifer attended with her attorney. Robert was still incarcerated in Colorado and was not present at the hearing, although his attorney was there. The court held that Jennifer could begin a sixty-day trial home placement beginning February 19, 2008, so long as she remained at, and complied with the rules of, her current treatment facility (B.A.R.B.S. Place). The court stated that, if Jennifer left the facility without authorization, A.F. would be immediately returned to foster care. The court continued the goal of reunification and found that DHS had made reasonable efforts to provide reunification services. The court found that Jennifer had complied with the case plan and its orders. As before, the

court ordered Robert to follow the case plan upon his release from incarceration. The court also permitted the Office of Child Support Enforcement to intervene in this action and directed DHS to facilitate DNA testing to determine Robert's paternity. The court held that, if such testing proved his paternity, he would have an obligation to pay child support.

On April 25, 2008, Jennifer left B.A.R.B.S. Place without permission, and abandoned A.F. there. DHS placed him back in foster care. B.A.R.B.S. Place would not let Jennifer return but made arrangements for her to attend an outpatient program. She became suicidal after A.F. was returned to foster care, and was admitted to Levi Hospital. Upon her release, she stopped cooperating with DHS. After Jennifer essentially dropped out of participating in the case plan, Robert took a more active interest in the proceeding. He wrote his attorney on May 5, 2008, and the trial court on May 21, 2008.

The court held another review hearing on May 15, 2008, which Jennifer attended with her attorney. Robert's attorney was present, and Robert participated in the hearing by telephone. Jennifer admitted consuming alcohol the weekend she had abandoned A.F. at B.A.R.B.S. Place. The court continued the goal of reunification and found that DHS had made reasonable efforts. The court found that Jennifer had not complied with the case plan and suspended visitation. The court stated that it would extend the time for the permanency-planning hearing because Robert anticipated a release date in August 2008.

The circuit court permitted Jennifer's father, Norman Fuller, to intervene. Fuller filed a petition for custody and a motion for visitation. The court granted him visitation. Robert's parents, James and Josephine Friend, filed *pro se* petitions to intervene and for custody.

The permanency-planning hearing was held on September 18, 2008. Although Jennifer attended with her attorney, Robert did not attend because he was still incarcerated. His attorney was present. The court determined that it was in A.F.'s best interest that the goal of the case be changed to termination, finding that DHS had made reasonable efforts to finalize a permanency plan and that appellants had not complied with the case plan or orders of the court. The court suspended visitation.

DHS filed a petition for termination listing several grounds, including appellants' inability to be rehabilitated during a twelve-month period, their failure to provide material support or maintain meaningful contact with A.F., abandonment, subsequent "other factors" that had not been remedied, sentencing in a criminal proceeding, and little likelihood that services to the family would result in successful reunification. Fuller and the Friends filed petitions to adopt A.F. Robert filed a motion for continuance, stating that he would be released from prison and back in Arkansas by January 20, 2009.

The court held the termination hearing on December 18, 2008. Jennifer attended with her attorney. Robert participated by telephone, and his attorney was at the hearing. Jennifer chose not to testify. Freeman Peters, the caseworker between November 28, 2007, and June 21, 2008, testified that Jennifer had completed her parenting classes on August 31, 2007, submitted to individual counseling, and received two psychological evaluations. He also testified regarding her participation in two inpatient drug-treatment programs. Peters testified that Jennifer contacted him once before the court hearing in May but did not contact him again; he had no information about her housing or employment after June 2008. Peters described

Jennifer as "selfish" and "an unfit mother," saying that she did not put her son first, and that she made decisions that jeopardized his safety. He said that A.F. needed a permanent home, where he had someone on whom he could rely, and recommended that A.F. not be returned to Jennifer.

Peters testified that Robert refused to take a paternity test the first time he was asked, but complied in May 2008, after the court ordered him to take it. Peters said that he was aware that Robert's parents had petitioned to intervene in this case in September 2008, that they were always compliant, and that they were concerned about A.F. He said that, before September 2008, the Friends had indicated to him that they would like to have A.F. but believed that they were too old take care of him. He said that their ages would be his only concern.

Jamie Moran, the primary caseworkers' supervisor, recommended that the parental rights of both parents be terminated. Moran testified that Robert had not contacted her "whatsoever" and that she was not aware of whether he had been able to complete the case plan or court orders. She said that one reason why she could not recommend that A.F. be returned to Robert was his potential resumption of cohabitation with Jennifer, who had not followed the case plan or court orders.

Moran said that A.F. had regressed after his placement with Jennifer, but had been fairly stable since then. She said that he had no medical problems but did need speech therapy. She testified that he had been in foster care for half of his life and needed stability and permanency. An adoption specialist testified that, because of A.F.'s age and the fact that he has no major medical problems, he is adoptable. She said that DHS had received inquiries about him and that adoption was in his best interest.

A.F.'s foster mother, Joy Lane, testified that, when A.F. came into her home at the end of April 2008, he was very clingy and insecure and called everyone, including the dog, "mommy." She said that he had since become much more secure but needed long-term stability. She stated that she was very concerned about him and that he needed to have a permanent home as soon as possible. Deputy Joe Dempsey testified that there were active city warrants out for Jennifer for endangering a minor and public intoxication.

Josephine Friend testified that, even though she had been told by DHS in July 2007 that A.F. would be placed with her and her husband, she "never heard another word" from DHS. She said that she did not even get to see him until months later. In detail, she described her numerous and largely futile efforts to contact the caseworkers.

Robert testified by telephone. He explained his initial refusal to submit the DNA sample for the paternity test by stating that he was not informed of its purpose. He testified that he had a mandatory release date of February 24, 2009, and that he would be back in Arkansas by the next day. He said that he intended to live with his parents in Hot Springs Village and apply to work at Village Lube, where he had worked in the past. Robert anticipated staying with his parents for two months before getting his own place to live. He stated that he would do anything to comply with the case plan and would also comply with the parole board's requirements. Robert admitted having earned money in the prison's canine unit without arranging to have any of it sent for A.F.'s care. He said that, when Jennifer was pregnant and he was on parole for motor-vehicle theft, he had left Colorado without permission, in violation of the terms of his parole.

In the termination order, the court found that, despite reasonable efforts by DHS, and A.F.'s seventeen months in DHS's custody, neither parent had complied with the case plan or the court's orders. The court found that A.F. was very adoptable and that it was in his best interest that appellants' parental rights be terminated. The court found that it would be contrary to A.F.'s best interest, health, safety and welfare to return him to the care of either parent. It also found that A.F. had been adjudicated dependent-neglected and had continued out of the custody of his parents in excess of twelve months, and despite a meaningful effort by DHS to rehabilitate appellants and correct the conditions that caused removal, those conditions had not been remedied by the parents. *See* Ark.Code Ann. § 9–27–341(b)(3)(B)(i)(a) (Repl.2008). The court further found that neither parent had provided significant material support or maintained meaningful contact with A.F. *See* Ark.Code Ann. § 9–27–341(b)(3)(B)(ii)(a). It also found that, subsequent to the filing of the original petition for dependency-neglect, other factors had arisen that demonstrated that return of A.F. to the family was contrary to his health, safety, or welfare and that, despite the offer of appropriate family services, appellants had manifested the incapacity or indifference to remedy the subsequent issues or factors or to rehabilitate their circumstances, which prevented return of the child to the family home. *See* Ark.Code Ann. § 9–27–341(b)(3)(B)(vii). The court also found that appellants had subjected A.F. to aggravated circumstances by abandoning him and that there was little likelihood that services to the family would result in successful reunification. *See* Ark.Code Ann. § 9–27–341(b)(3)(B)(ix)(a)(3).

The court stated that, throughout this case, DHS had provided reasonable reunification efforts and added:

The failure to comply with the case plan and this Court's orders [includes], but not limited to, a lack of stable residence and employment, dismissal from drug treatment prior to completion of treatment, mother's failure to remain clean and sober, coupled with a drug/alcohol history, failure to properly supervise and care for her child, and leaving the child alone during inappropriate circumstances. The mother has not shown that she has engaged in or participated in counseling as order by this Court. The father remains incarcerated in Colorado and has not maintained meaningful contact with the juvenile and had not complied with the case plan and the orders of this Court.

Both parents filed timely notices of appeal.

A heavy burden is placed upon a party seeking to terminate the parental relationship, and the facts warranting termination must be proven by clear and convincing evidence. *Strickland v. Ark. Dep't of Human Servs.*, 103 Ark.App. 193, 287 S.W.3d 633 (2008). The question this court must answer is whether the trial court clearly erred in finding that there was clear and convincing evidence of facts warranting the termination of parental rights. *Hall v. Ark. Dep't of Human Servs.*, 101 Ark.App. 417, 278 S.W.3d 609 (2008). Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents, but parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Dowdy v. Ark. Dep't of Human Servs.*, 2009 Ark.App. 180, 314 S.W.3d 722. Pursuant to Arkansas Code Annotated section 9–27–341(b)(3)(A) (Repl. 2008), an order terminating parental rights must be based on a finding that termination is in the child's best interest, which includes consideration of the likelihood that the juvenile will be adopted and the

potential harm caused by returning custody of the child to the parents. The harm referred to in the termination statute is "potential" harm; the circuit court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Lee v. Ark. Dep't of Human Servs.*, 102 Ark.App. 337, 285 S.W.3d 277 (2008). In addition, the proof must establish at least one of several statutory grounds. Ark.Code Ann. § 9–27–341(b)(3)(B). This court gives a high degree of deference to the trial court, as it is in a far superior position to observe the parties before it and judge the credibility of the witnesses. *Dowdy, supra.*

▆▆ Appellants concede that A.F. is adoptable. Jennifer argues that the trial court's findings that termination was in the best interest of A.F. and that grounds existed for termination were not supported by the evidence. The essence of her argument is that she lost custody of A.F. because she was in the grip of a disease—alcoholism—and that, with more time and reunification services, she could heal and become a fit parent. We cannot agree. The evidence that supports the finding that returning A.F. to either appellant held ⌐₁₁potential harm also supports grounds as to both parents. Only one ground is necessary to terminate parental rights. *Lee, supra.* Although the trial court found several grounds, we base our decision to affirm on only one ground— that, in spite of the many services DHS provided while A.F. was out of her custody for seventeen months, Jennifer failed to rehabilitate herself or to correct the conditions that caused A.F. to be removed from her custody. *See* Ark.Code Ann. § 9–27–341(b)(3)(B)(i)(a). When DHS took A.F. into custody, he was in dire need of protection from the situation in which his parents had placed him. His mother was an alcoholic who was, at that moment, under arrest for public intoxication. His father's care was not an option, as discussed below.

Even though Jennifer participated in two inpatient drug programs, she left both programs before completion. The first time, she was able to return and complete the program. At the next program, B.A.R.B.S. Place, she was allowed to care for A.F. in a trial home placement while she was an inpatient. Before the court placed A.F. with her, it strongly cautioned her not to leave the facility without permission and to follow all of its rules. Nevertheless, Jennifer abandoned A.F. at the facility from a Friday to a Monday so she could go drink with a friend. She never completed the program, nor any other after that time. She stopped contacting her caseworker and failed to demonstrate that she had stable employment or housing, as the court had ordered. A parent's lack of stable housing or employment, as well as an untreated substance-abuse problem, are factors that our courts have considered in affirming termination orders. *See Long v. Ark. Dep't of Human Servs.*, 369 Ark. 74, 250 ₁₂S.W.3d 560 (2007); *Carroll v. Ark. Dep't of Human Servs.*, 85 Ark.App. 255, 148 S.W.3d 780 (2004). Accordingly, we affirm the termination of Jennifer's parental rights.

Robert argues that he could not participate in the case plan while he was incarcerated; that he loves A.F. and wants to be a father to him; that he is not an alcoholic and was not intoxicated like Jennifer was when A.F. was removed from their custody; that the trial court, DHS, and his attorney essentially ignored him in spite of his numerous letters begging to be a part of this proceeding; that DHS failed to offer him any reunification services; and that DHS and the trial court utterly disregarded his parents' attempts to intervene in this proceeding, to gain custody of, or to adopt A.F.

▆▆ Robert, however, did not raise his argument about the failure to provide

reunification services to him while he was in prison below and cannot do so for the first time on appeal. *See Jones–Lee v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 160, 316 S.W.3d 261. Further, he has not specified anything that DHS could have provided him while he was imprisoned outside the court's jurisdiction. The trial court did direct that Robert comply with the case plan and court orders upon his release, if he had an interest. Although imprisonment imposes an unusual impediment to a normal parental relationship, it is not conclusive on the issue of termination. *Crawford v. Ark. Dep't of Human Servs.*, 330 Ark. 152, 951 S.W.2d 310 (1997). Nevertheless, a parent's imprisonment does not toll his responsibilities toward his child. *Malone v. Ark. Dep't of Human Servs.*, 71 Ark.App. 441, 30 S.W.3d 758 (2000). Tolling a parent's obligations to comply with reunification orders while he is in jail would be contrary to the goal of the juvenile code to provide permanency for the child. *Id.; see also Zgleszewski v. Zgleszewski*, 260 Ark. 629, 542 S.W.2d 765 (1976). The appropriate inquiry where a parent has been ordered to comply with a court's reunification orders and is incarcerated is whether the parent utilized those resources available to maintain a close relationship with the child. *Malone, supra.*

It is true that, because of A.F.'s young age, cards and letters from Robert would not have been significant, *see Zgleszewski, supra;* that Robert was under a "no-contact" order; and that parenting classes were not available to him in prison. We recognize that there were not many actions Robert could have taken to demonstrate his willingness to follow the case plan or court rules. Nevertheless, he has shown no prejudice from the trial court's refusal to postpone the termination hearing until after his release. We will not reverse a circuit court's denial of a motion for continuance unless the court abused its discretion and the appellant can show prejudice. *Jones–Lee, supra.* Under Arkansas Code Annotated section 9–27–338(c)(5) (Repl.2008), the trial court is permitted to continue with the goal of reunification "only when the parent is complying with the established case plan and orders of the court, making significant measurable progress towards achieving the goals established in the case plan and diligently working toward reunification." In addition, it must be shown that reunification is "expected to occur within a time frame that is consistent with the juvenile's developmental needs." Ark.Code Ann. § 9–27–338(c)(5)(B). "The burden is on the parent to demonstrate genuine, sustainable investment in completing the requirements of the case plan and following the orders of the court in order to retain reunification as the permanency goal." Ark.Code Ann. § 9–27–338(c)(5)(D). Although Robert could not participate in the case plan while he was in Colorado, that did not mean that he bore no responsibility for having created his situation.

In deciding whether to terminate the parental rights of a party, the circuit court has a duty to look at the entire picture of how that parent has discharged his duties as a parent. *In re Adoption of K.M.C.*, 62 Ark.App. 95, 969 S.W.2d 197 (1998). It is undisputed that, when A.F. was removed from Robert's custody, Robert was a fugitive from Colorado's criminal-justice system. Because Robert had not yet satisfied his obligations in Colorado, and had fled to Arkansas with A.F.'s alcoholic mother, he had placed A.F.'s safety and well-being in jeopardy. At the time of the termination hearing, he was still in prison, and had, therefore, not yet corrected the conditions that led to A.F.'s being placed in custody. Robert admitted at the termination hearing that he might reconcile with Jennifer, which

would again place A.F. in danger. He would not concede that Jennifer's alcoholism and intoxication were dangerous to A.F. Additionally, Robert's plan after his release in January 2009 was to live with his parents for a few months until he got back on his feet. Whether he would be able to accomplish the goals of obtaining a home and a job was uncertain. We cannot, therefore, say that the circuit court erred in terminating Robert's parental rights, in light of his obvious inability to provide a stable home for A.F. within a time frame consistent with his developmental needs, *see* Ark.Code Ann. § 9–27–338(c)(5)(B), or within a reasonable period of time viewed from A.F.'s perspective. *See* Ark.Code Ann. § 9–27–341(a)(3).

Robert has also shown no error or prejudice in the trial court's failure to place A.F. with his parents as a less restrictive alternative. According to Arkansas Code Annotated § 9–27–338, which lists the permanency goals that the circuit court is allowed to consider, termination and adoption are preferred to other placements if the child cannot be returned to the parent's custody. The top preference is returning the juvenile to the parents if it is in the best interest of the juvenile and the juvenile's health and safety can be adequately safeguarded if returned home. *See* Ark.Code Ann. § 9–27–338(c)(1). The second preference is adoption unless the juvenile is being cared for by a relative and termination of parental rights is not in the best interest of the juvenile. *See* Ark. Code Ann. § 9–27–338(c)(2); *Hall v. Ark. Dep't of Human Servs.*, 101 Ark.App. 417, 278 S.W.3d 609 (2008). Permanent relative placement is listed as the fourth preference. *See* Ark.Code Ann. § 9–27–338(c)(4). Thus, according to the public policy of this state, termination and adoption are preferred to permanent relative placement.

Affirmed.

PITTMAN and BROWN, JJ., agree.