BART F. VIRDEN, Judge
Appellant Michael Scott appeals from the Logan County Circuit Court's termination of his parental rights to his children, M.S. (DOB: 7-1-2002), B.S. (DOB: 10-3-2007), and T.S. (DOB: 9-28-2012).[1] Michael argues that there was insufficient evidence of grounds for termination and that the trial court erred in finding that termination of his parental rights was in his children's best interest. We affirm the trial court's decision.
I. Procedural History
On September 2, 2016, the Arkansas Department of Human Services (DHS) filed a petition for emergency custody and dependency-neglect as to the Scotts' children. In an affidavit attached to the petition, a DHS family-service worker attested that DHS visited the home on August 31, 2016, because there was an open protective-services case on the family. The children's mother, Charla Scott, tested positive for illegal drugs and medication for which she had no prescription. Charla was the only one at home with the children, as Michael was at work. The children were taken into DHS custody. When Michael returned home from work, he went to the DHS office where, the family-service worker attested, he became "verbally aggressive." The family-service worker stated that Michael had cursed at and threatened the workers and that he had said that he was "going to get a gun because no one is taking [his] kids." The affidavit also indicated that DHS/DCFS had had a history with the family since 2010. There was a true finding of inadequate supervision as to Charla, a true finding of cuts, bruises, and welts as to Charla, a true finding of medical neglect against Michael, a true finding of neglect against Charla, and a true finding of sexual abuse against Charla's boyfriend.
The trial court entered an ex parte order for emergency custody and later found that probable cause existed to issue the order. Michael was ordered to submit to random drug screens, watch "The Clock is Ticking" video, attend parenting classes, obtain and maintain stable and appropriate housing and stable and gainful employment, submit to a psychological evaluation and follow any recommendations, attend counseling, keep DHS informed of his contact information, and resolve all criminal issues.
On January 4, 2017, the trial court adjudicated the children dependent-neglected based on neglect due to inadequate supervision and parental unfitness. Michael stipulated to the finding and was ordered to complete the same tasks and services as *466 set forth in the probable-cause order. A review order was entered on February 15, 2017, in which the trial court found that Michael had complied with the case plan in that he had started parenting classes, worked at McDonald's, attended counseling, maintained his home, and filed for divorce from Charla. The trial court noted, however, that Michael "does not always make the best decisions." Another review order was entered on May 23, 2017, in which the trial court found that Michael had partially complied with the case plan in that he had completed parenting classes; he was visiting his children; he worked as a manager at McDonald's; he was attending counseling; and he had divorced Charla. The trial court noted, however, that DHS had encountered Charla at Michael's home on April 10 and that Michael and Charla had been arrested for a domestic-violence incident that occurred on April 23 at Michael's home. A permanency-planning order was entered on August 23, 2017. In granting DHS's request to change the goal of the case from reunification to adoption, the trial court found that Michael had a "toxic" relationship with Charla, "which inhibits him from raising his kids." The trial court further found that Charla had been to Michael's home and that the police had been called, that Michael was not attending counseling, that Michael should not discuss termination of parental rights with his children during visitation, that the parents were not making progress, and that the children need permanency.
On September 16, 2017, DHS filed a petition for termination of the Scotts' parental rights. As to Michael, DHS alleged three grounds pursuant to Ark. Code Ann. § 9-27-341(b)(3)(B) (Supp. 2017). A termination hearing was held on November 1, 2017.
II. Termination Hearing
Ronnie Goff, Michael's therapist at Western Arkansas Counseling and Guidance Center, testified that he treated Michael for major depression and anxiety, which he said likely stemmed from losing his children and feeling as though he could not regain custody of them. He said that he had visited with Michael five times since January 2017 and that Michael had missed four sessions without calling. Goff stated that Michael was "a little resistant" during sessions and that he "didn't seem to listen to much that was said about what he could do to improve his state of mind." He testified that he had offered Michael medication but that Michael had refused. Goff stated that Michael had made "very little progress." Goff testified that Michael "cares deeply for his children" and that
I do not feel like Mr. Scott, in his current mental state, is an immediate danger to his children. I have no indication that he exhibits any type of abusive behaviors. If his children were placed in his care, through what I know from Mr. Scott, those children wouldn't necessarily be in danger from his depression.
Goff stated, however, that he had not been able to get an accurate picture of Michael's parenting skills because Michael had attended so few sessions.
Pamela Feemster, a family-service worker with the Logan County DHS, provided testimony similar to what she had attested to in the affidavit attached to the petition for emergency custody and dependency-neglect. Steve Hodge, a DHS caseworker, testified that Michael had participated with the development of the case plan and that he had complied with parts of the case plan. He said that Michael had completed parenting classes in April 2017 and that he had submitted to a psychological evaluation. He said that Michael had started counseling, attended sporadically, *467 and then stopped going altogether. Hodge said that, after Western Arkansas Counseling and Guidance Center had closed his case, Michael asked for a new referral, which he gave him that day. Hodge stated that he understood that Michael had attended one session since that referral. He testified that Michael has maintained his housing and employment but that he did not budget well. He said, for example, there were occasions on which Michael was unable to buy lunch for his children during visits. Hodge stated that, although Michael completed four of the five things he had been asked to do, he did not think that Michael had substantially complied with the case plan or made substantial progress.
Hodge said that Michael's visits with the children were, for the most part, good. He said that there was not much excitement or affection during his visits with B.S., whereas there was a lot of affection shown toward T.S., along with playing and "constant chatter back and forth." He testified that M.S. had run away from her placement. Hodge stated that the potential for adoption of B.S. and T.S. was "very good" but that he did not think that M.S. wished to be adopted, and given her tendency to run away, "she would not probably currently be highly adoptable." He testified that, although Michael had divorced Charla, he continued to be "in a relationship of some sort" with her. Hodge said that, while Michael had made some progress, "in looking at the problems at the beginning of the case and the problems that we see now, I'm not seeing the substantial and measurable progress."
B.S.'s foster mother for the past year testified that school officials "want to know when visitations are so that B.S. can meet with the counselor after visitations to get him back to a calm state of mind before going back into the class for [an] outburst." She said that B.S. had spoken of missing his younger sister and that, although he had spoken of his father, he "doesn't really feel loved by his dad or as important as his little sister to his dad." She further testified that, when B.S. was not visiting with his father, there was "a notable difference" in that "[B.S.] was just all-around happier" and acted as though "a weight [had been] lifted off of his shoulders." She said that it was normal for B.S. to wet the bed for two or three nights after visitation with Michael but that the bed-wetting had stopped.
Several police officers from the Paris Police Department testified. Jared Petz stated that he had had at least five contacts with Michael since he started at the department in May 2015 and that he had arrested Michael two or three times. He said that the contacts were related to domestic-violence issues between Michael and Charla. He testified that he had arrested Michael for domestic battery but that the charges had been dropped and that there was a no-contact order in place between Michael and his ex-wife. Lieutenant Robin Ellington testified that the department had "dealt with Michael Scott many, many, many, many times over the years." Ellington said that the department had first dealt with the Scotts in 2004 with regard to domestic-violence issues and that the last report had been made in connection with an incident that occurred on July 19, 2017. Christopher Hayden testified that he had located a runaway juvenile at Michael's residence the night before the hearing. He said that he had encountered four people there but that Michael was not at home. Hayden said that he saw M.S. there but did not know at that time that she was also a runaway. After learning of her status, he returned to Michael's residence and detained M.S.
M.S. testified that she is fifteen years old and that she had been made aware of *468 the termination hearing by her mother. She said that she would like to see her and her siblings returned to their father. She stated that she and her siblings have a loving relationship with Michael, that Michael was not abusive, and that he could provide adequate supervision for them. She said that she thought he had been doing a good job as a father before the case was opened and that Charla was "much more to blame for the situation that me and my father are in." She said that, if Michael's parental rights are terminated, she will still consider him her father. As for Hayden's finding her the night before at Michael's residence, M.S. insisted that Michael had been at work and had not known that she was there.
Michael testified that he had divorced Charla in February or March 2017 and that she had been ordered to have no contact with him as part of the divorce. He said, however, that he had had five or six contacts with Charla because he had thought "maybe she'd straighten[ed] up" but that staying in contact with her had been "stupid." He said that his last contact with her was on July 19, 2017, and that she had come to his home and attacked him. He said that they both went to jail over the incident but that the charges had been dropped. He explained that M.S. had been messaging Charla but would not speak with him, so "it was the only way I could get in contact with my daughter." Michael agreed with the trial court's description of his relationship with Charla as "toxic" and said that he had had no communication with her since July. He stated that he understood that Charla was a danger to their children and insisted that he would keep them safe from her.
Michael said that he did not think he needed counseling and that he just needed his children back. He said that the reason he had refused medication recommended by his counselor was that he did not want to end up like Charla. He stated that he had missed some of his counseling sessions because he "did not wake up from working" and that other times his schedule had been changed and he could not make it. He pointed out that he had always rescheduled the missed sessions. Michael stated that he needed "another couple of months of counseling and increased visits with the kids." He stated that he thought the only thing standing in the way of his getting his children back was the fact that he had not completed counseling. Michael testified that "everything [DHS has] asked, I've done."
III. Termination Order
Pursuant to Ark. Code Ann. § 9-27-341(b)(3)(A), an order forever terminating parental rights shall be based on a finding by clear and convincing evidence that it is in the best interest of the juvenile, including consideration of the likelihood that the juvenile will be adopted if the termination petition is granted and the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. The order must also find by clear and convincing evidence one or more grounds. Ark. Code Ann. § 9-27-341(b)(3)(B).
In terminating Michael's parental rights, the trial court relied on the three grounds alleged in DHS's petition: Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(a) (the juvenile has been adjudicated dependent-neglected and has continued out of the custody of the parent for twelve months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent); Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a) (other factors or issues arose subsequent to the filing of the original *469 petition for dependency-neglect that demonstrate that the placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy those issues or rehabilitate the parent's circumstances, which prevent the placement of the juvenile in the custody of the parent); and Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(a)(3)(A) & (B) ("aggravated circumstances," which means, among other things, that a determination has been made by a judge that there is little likelihood that services to the family will result in successful reunification).
As for the failure-to-remedy ground, the trial court found that, although Michael had complied with the case plan in some respects, he had attended only five out of nine counseling sessions. The trial court noted the therapist's testimony that Michael had made little progress and that he had not followed the recommendations. The trial court stated that the case began because Michael had trusted Charla to care for the children while he was at work, despite her substance-abuse issues. The trial court found that Michael and Charla had a toxic relationship with "constant instability" and domestic-violence incidents and that, even after Michael had divorced Charla, Michael admitted having contacted Charla five or six times. Regarding the subsequent-factors ground, the trial court noted Michael's lack of progress dealing with his mental-health issues through counseling and his statement that he did not want counseling-he just wanted his children back. On the aggravated-circumstances ground, the trial court found that, despite the provision of services, there was still "chaos in the home." The trial court also noted that Michael had missed four out of nine counseling sessions and had not followed his therapist's recommendations. The trial court pointed out that, while Michael loves his children, "he thinks this case is all about him, not his children."
Next, the trial court found that B.S. and T.S. are adoptable and that M.S. may become adoptable once she is in a stable placement and works on her issues through counseling. The trial court also found that there was potential harm in returning the children to the parents given the toxic relationship between Michael and Charla and Michael's refusal to remedy his issues through counseling.
IV. Standard of Review
We review termination-of-parental-rights cases de novo. Williams v. Ark. Dep't of Human Servs. , 2013 Ark. App. 622, 2013 WL 5872757. Grounds for termination of parental rights must be proved by clear and convincing evidence, which is that degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established. Id. The appellate inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. Id. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. Id. In resolving the clearly erroneous question, we give due regard to the opportunity of the trial court to judge the credibility of witnesses. Camarillo-Cox v. Ark. Dep't of Human Servs. , 360 Ark. 340, 201 S.W.3d 391 (2005). On appellate review, this court gives a high degree of deference to the trial court, which is in a far superior position to observe the parties before it. Id.
V. Discussion
A. Grounds
Michael challenges all three grounds found by the trial court, but we *470 address only the aggravated-circumstances ground. Proof of only one statutory ground is sufficient to terminate parental rights. Sharks v. Ark. Dep't of Human Servs. , 2016 Ark. App. 435, 502 S.W.3d 569. With respect to this ground, Michael argues that the trial court tried to use his "poor decision making" to support this ground. He states, however, that there was not much evidence to support this ground, other than his missing counseling appointments and the occasional presence of Charla in his life-but not the children's lives.
The purpose of the termination-of-parental-rights statute is to provide permanency in a juvenile's life in all instances in which the return of a juvenile to the family home is contrary to the juvenile's health, safety, or welfare, and it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time, as viewed from the juvenile's perspective. Ark. Code Ann. § 9-27-341(a)(3). Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents, but parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. Friend v. Ark. Dep't of Human Servs. , 2009 Ark. App. 606, 344 S.W.3d 670. In deciding whether to terminate the parental rights of a parent, the trial court has a duty to look at the entire picture of how that parent has discharged his or her duties as a parent. Id. A child's need for permanency and stability may override a parent's request for additional time. See Henderson v. Ark. Dep't of Human Servs. , 2010 Ark. App. 191, at 11, 377 S.W.3d 362, 368. Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. Shaffer v. Ark. Dep't of Human Servs. , 2016 Ark. App. 208, 489 S.W.3d 182.
DHS has provided services to Michael, and he has completed most of them. Michael was given the opportunity to get counseling to deal with his mental-health issues, but he missed almost as many counseling sessions as he attended. Given his attitude in being resistant during sessions, not listening to and not following his therapist's recommendations, and his statement that he did not want or need counseling, it is doubtful whether additional counseling could have benefited him. The trial court apparently concluded that there were no other services that DHS could offer Michael that would result in his successful reunification with his children, and we agree with this conclusion. We are not left with a firm and definite conviction that the trial court made a mistake by terminating Michael's parental rights on the ground of aggravated circumstances.
B. Best Interest
Regarding best interest, Michael challenges only the potential-harm prong of the best-interest analysis. He does not challenge the trial court's finding that his children are adoptable. Instead, Michael argues that there was no evidence that the health and safety of the children would be in danger if they were returned to his custody. Michael states that there was no evidence that he would continue a relationship with Charla if the children were returned to him. Also, he points out that his therapist specifically testified that he is not a danger to his children.
In determining potential harm, the trial court may consider past behavior as a predictor of likely potential harm should the child be returned to the parent's care and custody. Harbin v. Ark. Dep't of Human Servs. , 2014 Ark. App. 715, 451 S.W.3d 231. The trial court is not required to find that actual harm would result or to affirmatively identify a potential *471 harm. Id. The potential-harm evidence must be viewed in a forward-looking manner and considered in broad terms. Id.
Michael stayed in contact with Charla after their divorce, despite their longstanding problems with domestic violence, and Michael failed to attend counseling and follow the recommendations of his therapist to deal with his mental-health issues. We cannot say that the trial court clearly erred in finding that there was potential harm in returning the children to Michael's custody. Further, while Goff testified that Michael's depression and anxiety would not harm the children or present a danger to them, the therapist also said that he could not get an accurate or full picture of Michael's parenting skills because Michael had attended so few counseling sessions and that he had made little progress in counseling.
Affirmed.
Abramson and Hixson, JJ., agree.

The trial court also terminated the parental rights of the children's mother, Charla Scott; however, she is not a party to this appeal.