Cite as 2024 Ark. App. 628

# ARKANSAS COURT OF APPEALS
## DIVISION II
No. CV-24-376

| | | |
|---|---|---|
| MARSELINA IBARRA | | |
| | APPELLANT | Opinion Delivered December 11, 2024 |
| V. | | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72JV-22-571] |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | | HONORABLE STACEY ZIMMERMAN, JUDGE |
| | APPELLEES | AFFIRMED |

### MIKE MURPHY, Judge

Appellant Marselina Ibarra appeals from the Washington County Circuit Court's order terminating her parental rights to her child, M.C.1 (DOB: 02-26-20).[1] On appeal, she argues sufficient evidence did not support the termination of her parental rights and challenges both the grounds and the best-interest finding. We affirm.

This case began on October 23, 2022, when the Springdale Police Department called the Arkansas Department of Human Services ("Department") to pick up M.C.1 because his father, Blake Wilson, was being arrested for domestic violence against Shelia Smith, his mother and M.C.1's grandmother. According to the affidavit attached to the petition for emergency custody, Wilson was erratic and appeared to be high on methamphetamine, and

---

[1]The father's parental rights were also terminated.

he did not want M.C.1 left with Smith. Ibarra was incarcerated at the time on a failure-to-appear charge. According to the affidavit, both Wilson and Ibarra have a history of illegal substance use and have spent time in jail as a result of charges related to illegal substances. The affidavit also noted that the Department had been involved with the family since 2014, but that no services were offered because the investigations were unsubstantiated.

After the Department filed a formal petition for custody and dependency-neglect, the court entered an emergency order and set the case for a probable-cause hearing. Prior to the hearing, Ibarra was released from jail, and she appeared with counsel. Ibarra stipulated to probable cause and testified that she was pregnant with another child (hereinafter referred to as M.C.2). The court found probable existed for M.C.1's removal and for his continued placement in foster care.

On December 9, 2022, the court adjudicated M.C.1 dependent-neglected due to parental unfitness and neglect. This determination was based on the parents' methamphetamine use, which was so severe that, upon entering foster care, M.C.1's hair-follicle test revealed a methamphetamine level of 6835 pg/mg (the cutoff amount is 100 pg/mg). The court further found that M.C.1 could not return to a parent at the adjudication hearing because neither parent had demonstrated stability, sobriety, or a safe and stable home. The court also noted Ibarra's testimony that she lived with Wilson's mother, Smith; that she was working at Casey's General Store a few days a week; and that she had a pending charge for delivery that was set for trial in February 2023. The court set a goal of reunification

and ordered Ibarra and Wilson to complete standard services, including individual counseling and residential drug treatment.

On April 26, 2023, the court found that the parents had made progress but needed to demonstrate prolonged stability. Specifically, the court found that the parents had completed a drug-and-alcohol assessment, completed inpatient rehabilitation, completed parenting classes, submitted to a psychological evaluation, were in counseling services, and submitted to random drug screens. The court ordered that the parents resolve their outstanding legal issues and pass a ninety-day hair-follicle test to have unsupervised visitation. The court noted that Ibarra had been employed with Goodyear for a month with the possibility of it becoming permanent in six months, that her court date for her criminal charge had been moved to July 2023, that she was in compliance with her parole and free of arrest warrants, that she was trying to get admitted to drug court, and that she attended weekly group sessions through her parole as well as a women's support group. Ibarra testified that she was living with Smith.

On August 2, the court held a second review hearing in which it found that Ibarra had passed her May 2023 hair-follicle test, but Wilson tested positive for methamphetamine. The court found that before unsupervised visits could start, Wilson needed to have a negative hair-follicle test, and the Department needed to check that the home was safe and appropriate because Ibarra was still living with Wilson and Smith. Additionally, the court found Ibarra had maintained employment for almost a month. It was noted that Ibarra had given birth to M.C.2.

A permanency-planning hearing was held on October 4 wherein the court changed the goal to adoption. To support its decision, the court found that M.C.1 had witnessed a violent incident between Wilson and Ibarra, and it noted that Ibarra was not making measurable or substantial progress. The court found Ibarra to be in partial compliance because the home she shared with Smith was not safe or appropriate since Wilson still visited the home, and Ibarra had not demonstrated she can keep M.C.1 safe. It further ordered the Department to file a termination-of-parental-rights petition by November 1.

The Department filed its petition on November 1 alleging only one ground—that M.C.1 had been out of the home for twelve months and that Ibarra failed to remedy the issues that caused removal. On December 22, the ad litem filed a termination petition based on the twelve-month failure-to-remedy and subsequent-factors grounds.

A two-day hearing was held on January 31 and February 15, 2024. At the start of trial, the Department made an oral motion to withdraw its petition, which the court granted, and the hearing proceeded on the ad litem's petition. A Washington County prosecutor testified first and explained that she is prosecuting Ibarra on her current pending felony charges and that the sentencing guidelines recommend fifteen to forty years' imprisonment. She testified she offered Ibarra a plea deal of twenty years in the Arkansas Division of Correction with eight years suspended, leaving her twelve years to serve.

An Elm Springs police officer testified that the police department is across the street from Smith's house. He stated he has seen Ibarra driving around town but knows her license is suspended. He has also interacted with Smith's husband, Jody Smith, and another son of

4

hers, Gage, who has an extensive criminal history for possession of drug paraphernalia and pills. He testified that Gage frequents the house. The officer testified that after the court changed the goal at the permanency-planning hearing, he was called out to an altercation at Smith's house where Wilson was found with fentanyl and taken into custody. Wilson is currently serving a one-year sentence with an additional four years' suspended imposition of sentence.

Ibarra testified. She explained that Jody is Smith's husband but that he and Gage live two houses behind Smith's. Ibarra testified that since the permanency-planning hearing, she left Smith's house to go to a transitional living facility but left after about a week due to conflict and because it was not what she expected. She explained she then moved into Smith's aunt's house but eventually was asked to leave because the aunt fell and hurt her hip and was going to an inpatient facility. She testified that since the permanency-planning hearing, she worked at a bank and is currently working at Goodwill. She testified that she consistently passes her drug screens and that she has been clean for over a year. Ibarra asked that the court not terminate her rights and grant guardianship to Wilson's relatives, the Aveys, until she gets her legal issues resolved. She testified that she believed Smith's house is safe and appropriate whenever Wilson is not there and under the influence of drugs. When asked where she would live if Wilson were not incarcerated, she stated that she could probably move to her dad's house in Little Rock. The ad litem followed up and asked why she had not yet done so when the court made it clear at the last hearing that she was not protecting her children by having Wilson in and out of the home. Ibarra responded that she

5

was trying to help Wilson get back on track. When asked who is her priority, Wilson or her children, Ibarra answered, "My family is my priority."

The Court Appointed Special Advocate ("CASA") testified and introduced a report recommending that Ibarra's parental rights not be terminated and that the goal of the case continue to be adoption with a concurrent plan of guardianship.

The foster mom testified that M.C.1 has been with her since June 2023. She testified that visits have been inconsistent and that visitation days continue to be difficult. She explained she sees both physical and emotional dysregulation in M.C.1, including separation-anxiety behaviors, on those days. She testified she is interested in adopting him.

Sarah Avey testified that her home study was approved and that she and her husband are seeking guardianship of M.C.1 to help transition back to reunification with his parents. She testified that her family has not spent time with M.C.1 and do not currently have a relationship with him. She has three biological children. When asked if she would be open to adopting M.C.1 if reunification was not possible, Avey said it would depend on if it would be best for her children, and then if it would be best for M.C.1.

The family service worker (FSW) testified that she had been the assigned caseworker since October 2023. She testified to the safety plan the Department put into place in December 2023 wherein Ibarra moved out of Smith's house into a transitional living facility and then to an aunt's house but returned to Smith's house. The FSW testified that she agreed to Ibarra's returning to Smith's house when the aunt's house did not work out because Wilson was incarcerated. The FSW further testified that Ibarra has a strong bond

with M.C.1 and that the Department wished for a guardianship placement with the Aveys until reunification was possible.

The program assistant for the Department testified that she had supervised the visitations between Ibarra and M.C.1 since he came into care. She testified that the visits go well and that Ibarra always brings food, extra clothing, and toys and activities to the visits. She testified that Ibarra is receptive to criticism and parenting suggestions. The program assistant believed that M.C.1 and Ibarra have a close bond. In closing, the Department asked that the ad litem's petition be denied and that the goal of the case remain guardianship for M.C.1.

Following the hearing, the court terminated Ibarra's parental rights, finding that the ad litem proved the grounds of twelve-months failure to remedy and subsequent factors by clear and convincing evidence. It further found it was in M.C.1's best interest to terminate Ibarra's parental rights. Ibarra appealed.

Pursuant to Arkansas Code Annotated section 9-27-341(b)(3) (Supp. 2023), an order forever terminating parental rights shall be based on clear and convincing evidence of one or more grounds. Ark. Code Ann. § 9-27-341(b)(3)(B). The trial court must also find by clear and convincing evidence that termination is in the best interest of the child, including consideration of the likelihood that the child will be adopted if the termination petition is granted and the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A).

7

On appeal, termination-of-parental-rights cases are reviewed de novo. *Burks v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 309, 634 S.W.3d 527. Grounds for termination must be proved by clear and convincing evidence, which is that degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established. *Id.* The appellate inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Bridges v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 50, 571 S.W.3d 506. In resolving the clearly erroneous question, we give due regard to the opportunity of the trial court to judge the credibility of witnesses. *Id.* Termination of parental rights is an extreme remedy and in derogation of a parent's natural rights; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Id.*

Because only one ground is necessary to terminate parental rights, *Burks*, *supra*, we will address the subsequent-factors ground. Arkansas Code Annotated section 9-27-341(b)(3)(B)(vii)*(a)* provides as a ground for termination that other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or

8

rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.

Throughout the entirety of the case, Ibarra was never in full compliance with the case plan. Specifically, as relied on heavily by the trial court, she did not ever have a stable and safe home of her own. Testimony established that Ibarra lived at Smith's house during most of the case, even when Wilson had relapsed and was still allowed around the house. While she left Smith's house briefly for the transitional facility and then the aunt's house, she ultimately returned to Smith's house about a month later. In *Gonzalez v. Arkansas Department of Human Services*, 2018 Ark. App. 425, at 7, 555 S.W.3d 915, 919, we did not credit the mother for having stable housing when she stayed with friends and boyfriends from the onset of the case and never had proof of her own housing until the last minute. Here, Ibarra never attained her own housing. In addition to the lack of stability, the house was unsafe because Wilson frequented it with illegal substances, and Ibarra stated there was nothing she could have done to make him leave because he was "a grown man." This indifference supports the trial court's finding that Ibarra was incapable of protecting M.C.1 or providing M.C.1 a stable home. Moreover, while there is evidence that Ibarra had employment, it was sporadic and inconsistent.

Concerning her pending charges, Ibarra contends that she had been neither convicted nor sentenced, so the court's reliance on her pending charges as a determinative factor was legally errant. Notably, the prosecutor testified that due to her multiple felony charges, the sentencing guidelines recommend fifteen to forty years' imprisonment and that

she was offered a plea deal that would require her to serve twelve years. We disagree with how Ibarra frames the issue. It was clear from the ruling and order that the charges were not a determinative factor but rather a small piece of the larger picture. In deciding whether to terminate the parental rights of a parent, the trial court has a duty to look at the entire picture to discern how that parent has discharged his or her duties as a parent. *Scott v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 347, at 12, 552 S.W.3d 463, 470. Because M.C.1's protection and achieving permanency was of paramount concern, *Uren v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 317, at 8, 651 S.W.3d 724, 730, the trial court did not err in taking the pending charges into account.

Additionally, Ibarra's argument that her continued parenting of M.C.2 provided direct evidence of her fitness and ability to protect her children from potential harm is a request to reweigh the evidence. We have held that a court may not make an automatic finding of dependency-neglect based solely on dependency-neglect findings of siblings. *Haney v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 437, at 6, 526 S.W.3d 903, 907 (holding a trial court must assess the level of risk posed to a child instead of removing a child solely because siblings are in the Department's care). Here, there is no evidence of an assessment concerning M.C.2, and the focus of the case remained on M.C.1.

While it is admirable that Ibarra demonstrated sobriety throughout the case, she was never in full compliance with the case plan. But even full compliance with a case plan does not always mean more time is warranted. *Bentley v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 374, at 12, 554 S.W.3d 285, 293 ("What matters is whether Bentley's completion of portions

of the case plan achieved the intended result of making her capable of caring for [M.C.]"). Under these circumstances, we cannot say that the trial court clearly erred in finding that the subsequent-factors ground supported termination of Ibarra's parental rights.

Next, Ibarra challenges the potential-harm prong of the best-interest analysis. A potential-harm analysis must be conducted in broad terms, with the trial court considering the harm to the children's health and safety that might occur from continued contact with the parent. *Younger v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 138, at 13, 643 S.W.3d 487, 495. There is no requirement to find that actual harm would result or to identify the potential harm. *Id.* It is well settled that a parent's past actions over a meaningful period of time are good indicators of what the future may hold. *Id.*

After weighing and considering the evidence, the trial court ultimately believed that Ibarra still failed to understand how to protect M.C.1 and keep him safe from harm. Over a year into the case, Ibarra did not have stable and safe housing, had not resolved her criminal charges, and did not demonstrate she was capable of taking proactive measures to ensure her child's ongoing safety. The trial court found this could lead to potential future harm. As explained above, these findings are supported by the record.

Ibarra also draws our attention to the fact that the Department did not attempt to remove M.C.2 from her custody or add him to this case. Ibarra fails to explain how this point undermines the overall sufficiency of the evidence as it relates to M.C.1.

In *Black v. Arkansas Department of Human Services*, 2018 Ark. App. 518, at 7, 565 S.W.3d 518, 523, the appellant argued that because a younger sibling of the juvenile who

was the subject of a dependency-neglect case remained in the appellant's custody throughout the proceedings, the trial court's potential-harm finding was clearly erroneous. The appellant argued that the bases for the potential-harm finding should apply equally to both children and that if the parent is sufficiently fit to maintain custody of one, then the parent should be given custody of the other. *Id.* at 7, 565 S.W.3d at 523. Our court rejected this argument, stating, "[W]hen making its best-interest analysis, the circuit court must make an individual determination whether termination is in each child's best interest and cannot treat the children as an amorphous group in which the best interest of one will meet the interests of all." *Id.*, 565 S.W.3d at 523 (citing *Weatherspoon v. Ark. Dep't of Hum. Servs.*, 2013 Ark. App. 104, at 10, 426 S.W.3d 520, 526; *Dominguez v. Ark. Dep't of Hum. Servs.*, 2009 Ark. App. 404). We held that it was not reversible error for the trial court to give no weight to the appellant's relationship with a younger sibling at home when making its best-interest finding for the juvenile in DHS custody. *Id.*, 565 S.W.3d at 523. Similarly, we hold that it was not reversible error for the trial court in the case at bar to give no weight to Ibarra's relationship with the new baby in her custody when making its best-interest finding regarding M.C.1.

Accordingly, we are not left with a definite and firm conviction that the trial court made a mistake in finding it was in M.C.1's best interest to terminate Ibarra's parental rights.

Affirmed.

WOOD and BROWN, JJ., agree.

*Leah Lanford*, Arkansas Commission for Parent Counsel, for appellant.

*Dana McClain*, attorney ad litem for minor child.