Amanda YARBOROUGH *v.*
ARKANSAS DEPARTMENT of HUMAN SERVICES

CA 05-1014                                        240 S.W.3d 626

Court of Appeals of Arkansas
Opinion delivered October 4, 2006

*Glen Hoggard*, for appellants.

*John J. Petruccelli*, attorney ad litem for the juveniles.

JOSEPHINE LINKER HART, Judge. Amanda Yarborough and George Yarborough appeal from an order of the Faulkner County Circuit Court terminating their parental rights to their three minor children, A.Y., J.Y., and S.Y. On appeal, they argue that the trial court erred in finding that there was sufficient clear and convincing evidence to terminate their parental rights. We affirm.

At the hearing on the petition to terminate the Yarboroughs' parental rights, forensic psychologist Dr. Paul DeYoub testified that he conducted psychological evaluations of Amanda Yarborough in 2002 and 2005. The trial court took judicial notice of the December 17, 2002, report, because it had previously been admitted into evidence. Dr. DeYoub stated that in 2002, he

diagnosed Amanda with a "personality disorder" and a "mood disorder," but in 2005 "upgraded" his diagnosis of a "mood disorder" to "bi-polar disorder." He noted that the combination of a personality disorder and bi-polar disorder are "very resistant to treatment." Amanda's I.Q. in both evaluations was tested to be 85, which Dr. DeYoub assessed to be "low average." He opined that while that level of intelligence allows her to "function," her home schooling her children was a "terrible idea" because while Amanda could handle the task "academically," she was "unstable," and the children would "need time to be away from her." Dr. DeYoub noted that her mental condition was worse because the environmental stressors — her children, her husband, and the continued DHS involvement — were still present. Further, testing revealed that Amanda perceived her children as being mentally ill, and she was prone to "over-medicate" them. He opined that the children have "become disturbed because she is disturbed." He also noted a pattern where as her children get older, she "finds reasons to get them out of the house."

Regarding George, whom Dr. DeYoub noted that he did not evaluate, he expressed uncertainty about whether George was a "stabilizing influence on the family." While Amanda anticipated reuniting with him, she nonetheless claimed that George was an alcoholic, a methamphetamine addict, and an "abuser." Amanda acknowledged that one of her older daughters had alleged that George had sexually abused her, but Amanda blamed the daughter for being a "seductive teenager." Dr. DeYoub noted that since the 2002 evaluation, Amanda had increasingly come to regard "the children as the problem and herself as capable and competent." He opined that generally Amanda's situation with respect to her children and husband had gotten "worse," there was little prospect for improvement, and she was "largely unfit as a parent because of her own . . . mental health problems." Dr. DeYoub stated that Amanda's prognosis in 2002 was "poor" and that it was borne out by the persistence of her problems in 2005. Regarding Amanda's relationship with George, Dr. DeYoub stated that while he was "sure" that the children were "connected to their father," the "dysfunctional marital relationship" had created a problem for the children.

DHS caseworker Laura Rogers testified that she first became involved with the Yarboroughs' case in August of 2003 when five-year-old A.Y. was found at a convenience store, unsupervised. That began a case that was closed on July 13, 2004, but

subsequently reopened on August 30, 2004, when it was reported that A.Y. had not been enrolled in school. Rogers stated that three separate reports were "found true for environmental neglect" on the family, as well as the educational neglect of A.Y. Despite being ordered by the court not to home school A.Y., Amanda had held the child out of school and had been found in contempt. Rogers noted that when A.Y. and J.Y. were taken into foster care, they were on seven and three psychotropic medications, respectively; but currently A.Y. required only three medications and J.Y. only one. Rogers recalled that the Yarboroughs had received parenting classes, and Amanda was getting counseling. Amanda told her that she moved from Conway to Jonesboro to get away from George, although she indicated that she was planning to move back in with him.

Rogers noted that Amanda seemed disinterested in interacting with her children during the visits, often spending much of the eighty minutes allotted for weekly visits talking on the telephone or with case workers. Rogers opined that Amanda had gotten "worse" since the children were first identified as being "at risk." Rogers testified that she agreed with Dr. DeYoub's opinion that Amanda was "largely unfit as a parent." According to Rogers, since the children had been in foster care, they were "better off."

Rogers opined that the boys were "more bonded" with George, and S.Y. was "more bonded" with Amanda. Nonetheless, she noted that there was still need for DHS involvement after four years, and the parents were "worse" than they were a year or two earlier. Rogers testified that the Yarboroughs had been provided with parenting classes twice, and subsequent to completing the classes, the children were again taken into DHS custody.

Michelle Whatley, a DHS child-abuse investigator, testified that she investigated the Yarboroughs pursuant to a report of child maltreatment in August 2004. She found the home "filthy," "unsanitary," and "unsafe." She noted that the home was in substantially the same condition when similar complaints were lodged in 2003.

Amanda testified on her own behalf. She stated that she moved to Jonesboro "to get away from my husband, and also to get away from my family." She stated that she currently lived in a three-bedroom apartment that was being paid for by George. Amanda admitted that she had been in counseling for nine years and that she was currently in counseling in Jonesboro. She stated

that she was currently taking three medications for depression. Amanda attributed much of her problems as a parent to George, whom she accused of undermining her attempts to discipline the children. She stated that at times she was afraid of George and that there had been physical altercations in the past.

George testified that he was living in Greenbrier and was currently employed. He admitted that he had been incarcerated for committing domestic battery against Amanda. He testified that the domestic-battery charge arose from an incident when he came home from work and discovered that Amanda was playing computer games, a situation that he encountered "constantly." He stated that he put a firecracker on her computer and told her that she needed to either cook supper or let him know. According to George, Amanda got angry and grabbed his shirt. The two scuffled and fell. Amanda took two of the children and left. J.Y. did not have a shirt and shoes on, so she left him, and George cooked supper. The police subsequently arrived and arrested him despite the fact that Amanda started the fight. He conceded, however, that he had consumed a "couple of beers" and "had been out in the sun too long" that day. George also admitted to previously being arrested for domestic violence in 2001, although he claimed that he was falsely accused because Amanda hit him with a telephone while he was trying to take it away from her. George stated that it was a "constant problem" to get Amanda to clean the house and wash clothes. George testified that he believed that Amanda "needs to stay in counseling" and become more "motivated" to take care of the house. He also admitted that his drinking accounted for some of the previous problems in his family but claimed he was now a "recovering alcoholic." George conceded that his relationship with Amanda was "dysfunctional" but stated that he would give up the relationship in order to get his children back. He claimed that he was the parent that took care of the children for the last nine years.

Jaime Moore, Amanda's twenty-four-year-old daughter, testified that she would be willing to take custody of the three minor children. She stated that she had been inappropriately touched by George when she was thirteen years old. Jaime also claimed that she had been "raped and molested" by friends of her mother's, beginning when she was seven. She stated that she told her mother about the abuse, but her mother did not always believe her. When George molested her, she left the home. She claimed that although she told Amanda about the molestation, Amanda

married George approximately two weeks later. Moore stated that when she lived with Amanda, she was placed on psychotropic medication and was currently taking Zoloft for depression. She stated that her younger sister, Jennifer, was also put on medication. Moore described the condition of her home when she was growing up as "horrible," and she claimed that she took care of her younger sibling, including changing and feeding her, even though she herself was only five years old. She stated unequivocally that Amanda put her interests ahead of the interests of her children.

In her order terminating the Yarboroughs' parental rights, the trial judge found "there is little likelihood that services to the family will result in successful reunification" and substantiated her conclusion based on the following specific reasons:

> a. there have been multiple prior true reports of child maltreatment of these and older siblings by the parents;
>
> b. there have been multiple prior protective services cases open on the family for environmental and educational neglect;
>
> c. the psychological evaluations by Dr. Paul Deyoub concluded that the parents were chronically unfit and not likely to respond to treatment;
>
> d. that the mother has been in counseling for nine (9) years to no effect;
>
> e. the parents refuse to accept responsibility for their actions;
>
> f. that the previous dependency/neglect case was open for 11 months and had to be reopened one month after it was closed;
>
> g. the long-term history of alcohol and drug abuse; and
>
> h. the pattern of domestic violence between the parents while the children were present.

On appeal, the Yarboroughs argue that the trial court erred in finding that there was sufficient clear and convincing evidence to terminate their parental rights. They contend that there was insufficient evidence that the children were out of their custody for twelve months, that they had failed to rehabilitate the home

and correct the condition that caused the removal, and that they subjected the children to aggravated circumstances.

The grounds for termination of parental rights must be proven by clear and convincing evidence. *M. T. v. Arkansas Dep't of Human Servs.*, 58 Ark. App. 302, 305, 952 S.W.2d 177 (1997). When the burden of proving a disputed fact is by clear and convincing evidence, the question on appeal is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Dinkins v. Arkansas Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). This court reviews termination of parental rights cases de novo. *Id.*

We note first that DHS has conceded two of the Yarboroughs' subpoints, acknowledging that the children were not out of the home for more than twelve months and declining to challenge whether or not the environmental neglect had been remedied. DHS asserts, and we agree, that the grounds for termination were that the parents have subjected the children to aggravated circumstances. The Yarboroughs' attempt to characterize this as merely "an additional ground" that was "duplicative to the ground that the parents did not remedy their home nor their parental behavior" is simply mistaken—it was the entire basis for the termination of their parental rights. Accordingly, our focus will be on whether the trial court's findings relative to this ground are supported by the evidence.

In this case, the trial court terminated the Yarboroughs' parental rights pursuant to Arkansas Code Annotated section 9-27-341(b)(3)(A) and (b)(3)(B)(*ix*)(*a*)(3) (Repl. 2002). The relevant subsections of the statute provide as follows:

> (3) An order forever terminating parental rights shall be based upon a finding by clear and convincing evidence:
>
> (A) That it is in the best interest of the juvenile, including consideration of the following factors:
>
> (i) The likelihood that the juvenile will be adopted if the termination petition is granted; and

(ii) The potential harm, specifically addressing the effect on the health and safety of the child, caused by continuing contact with the parent, parents, or putative parent or parents;

(B) Of one (1) or more of the following grounds:

. . .

(ix)(a) The parent is found by a court of competent jurisdiction, including the juvenile division of circuit court, to:

. . .

(3) Have subjected the child to aggravated circumstances;

In our juvenile code, "aggravated circumstances" means that "a child has been abandoned, chronically abused, subjected to extreme or repeated cruelty, or sexually abused, or a determination has been made by a judge that there is little likelihood that services to the family will result in successful reunification[.]" Ark. Code Ann. § 9-27-303(6) (Repl. 2002). In the instant case, the trial court focused on the last definition of aggravated circumstances, that there is little likelihood that the services to the family will result in successful reunification. Because it is well-settled law that termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents, and will only be used where it is necessary to prevent the "destruction of the health and well-being of the child," *Johnson v. Arkansas Department of Human Servs.*, 78 Ark. App. 112, 119, 82 S.W.3d 183, 187 (2002), there must be more than a mere prediction or expectation on the part of the trial court that reunification services will not result in successful reunification. We hold that in this case, there was sufficient evidence that reunification services were unlikely to succeed.

■ With regard to Amanda, there was considerable expert testimony that she had deep-seated psychological problems, described by Dr. DeYoub as "very resistant to treatment." These psychological problems prevented Amanda from becoming a fit parent in that they caused her to refuse to accept responsibility for her actions and seek inappropriate treatment for the behavior of her children that Dr. DeYoub believed that she engendered. Moreover, due to the long-term involvement of DHS with the

Yarborough family, we have before us a record of repeated failures to remedy the problems that had required DHS involvement with the family. The Yarboroughs twice received parenting classes, yet still exhibited inappropriate parenting. Amanda admitted to receiving counseling for more than nine years; however, in the expert opinion of Dr. DeYoub, Amanda was getting "worse." Dr. DeYoub's assessment was shared by caseworker Laura Rogers, who had significant on-going contact with Amanda in the course of her long association with the Yarborough family. Given this long history of failure, we cannot help but conclude that the trial court did not err in finding that "there is little likelihood that services to the family will result in successful reunification." Ark. Code Ann. § 9-27-303(6).

We are mindful that the trial court's findings with regard to Amanda do not apply with equal force or validity as to George. George, however, was not represented by separate counsel either at the termination hearing or on appeal, and no argument was made either at the trial-court level or to this court that he should be treated differently. It is axiomatic that we will not make an appellant's argument for him.

Further, we note that the Yarboroughs fail to effectively challenge most, if not all, of the eight specific findings of fact that the trial court made in support of termination. The one finding that they specifically attack, "that the mother has been in counseling for nine (9) years to no effect," is challenged by way of an assertion that DHS did not offer "one shred of evidence related to Mrs. Yarborough's counseling" and is simply not well grounded in fact. Amanda's counseling was addressed by the testimony of Dr. DeYoub and Laura Rogers, as well as Amanda herself. Nowhere can we find that counseling was judged to be effective. Furthermore, while the Yarboroughs attempt to challenge on appeal Dr. DeYoub's qualifications to give expert testimony on this issue, we note that his credentials were not challenged at that hearing. Failure to timely raise this argument to the trial court waives this argument on appeal. *J. E. Merit Constructors, Inc. v. Cooper*, 345 Ark. 136, 44 S.W.3d 336 (2001).

Affirmed.

CRABTREE and GLOVER, JJ., agree.