Cite as 2020 Ark. App. 75

# ARKANSAS COURT OF APPEALS

DIVISION III

**No.** CV–19–627

|  |  |
|---|---|
| FRANKLIN PETERSON AND RACHEL PETERSON<br><br>APPELLANTS<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br><br>APPELLEES | **OPINION DELIVERED:** FEBRUARY 5, 2020<br><br>APPEAL FROM THE JACKSON COUNTY CIRCUIT COURT [NO. 34JV-17-22]<br><br>HONORABLE THOMAS GARNER, JUDGE<br><br>AFFIRMED |

**ROBERT J. GLADWIN, Judge**

Franklin Peterson and Rachel Peterson appeal the May 28, 2019 order of the Jackson County Circuit Court terminating their parental rights to their minor child, Z.P. (D/O/B February 24, 2017). Rachel challenges both statutory grounds relied on by the circuit court to terminate her parental rights, and Franklin challenges the statutory grounds on the limited argument that the Arkansas Department of Human Services (DHS) failed to prove adequate services were provided. We affirm.

I. *Facts and Procedural History*

Both Franklin and Rachel struggle with mental-health issues, are disabled, and receive supplemental security income for their disabilities. Z.P. was less than two weeks old when DHS investigated a call to the child-abuse hotline alleging concerns about her parents'

ability to appropriately care for Z.P. DHS exercised an emergency hold on Z.P. on March 3, 2017, and filed a petition for emergency custody and dependency-neglect on March 6.

The circuit court granted DHS emergency custody pursuant to an order entered on March 7. The court held a probable-cause hearing the same day and found that probable cause existed for Z.P. to remain in DHS custody. The court found that DHS had made reasonable efforts to prevent removal. The parents were permitted visitation with Z.P., and the court directed the parents to cooperate with DHS; comply with the case-plan requirements; obey the orders of the court; watch the video "The Clock is Ticking"; remain drug free; submit to random drug tests; keep DHS apprised of their contact information; submit to psychological evaluations if requested by DHS; follow recommendations of any psychological evaluation; complete parenting classes; maintain stable housing; maintain sufficient income; and participate in counseling as recommended. The circuit court appointed separate attorneys to represent Franklin and Rachel.

Z.P. was adjudicated dependent-neglected by means of an agreed adjudication order entered on May 30 based on "the inability of the parents to care for the juvenile at the time of removal." The goal of the case was set as reunification, and the case plan developed by DHS was approved. The court continued its prior orders.

The case was reviewed on August 1, 2017, and the resulting order continued the reunification goal and found that DHS had made reasonable efforts toward that goal. The specific services that supported the reasonable-efforts finding were listed as "transportation, parenting classes, medical services, psychological evaluation, PACE evaluation, clothing voucher, visitation, home visits, and drug screens." The parents were found to have complied with the case plan and court orders; however, the court also found that they had

2

failed to remedy the environmental concerns with the home, missed several visits, and still struggled with parenting skills. The prior orders of the court remained in effect.

An additional review hearing was held on November 7, at which time the court continued the reunification goal and found that DHS had made reasonable efforts by offering services to achieve that goal identical to the previous order. The parents were again found to be compliant with the case plan, and the court found that the parents had maintained a home, without finding environmental concerns. The court found that they had made some progress and had benefited from the services completed, but despite this compliance, the parents still had mental-health issues and lacked stability—including that Rachel had been hospitalized three times since the last hearing for mental-health issues, such as hearing voices. The court continued its prior orders.

Following a permanency-planning hearing, the court entered an order on February 13, 2018, changing the goal of the case to adoption with a concurrent goal of reunification. The court found that the parents' compliance, parenting skills, and housing conditions remained the same. DHS was ordered to continue to provide services, and the court detailed concerns relating to the home's environmental issues and the parents' ability to care for Z.P. Once again, the court found that DHS had made reasonable efforts through the exact same services supporting that finding.

DHS initially petitioned for the termination of both Franklin's and Rachel's parental rights on March 19, setting the termination-of-parental-rights (TPR) hearing for May 1. Thereafter, at the request of Franklin, the court continued the TPR hearing several times due to reasons concerning legal representation and pending out-of-state relative home studies.

3

On July 31, the court held a review hearing wherein it continued the goal of adoption and again found that DHS had made reasonable efforts on the basis of the same services. The court detailed safety concerns with the parents' mental-health issues and, as a result, discontinued visitation between Z.P. and Franklin and reset the TPR hearing for September 11. The court noted that an out-of-state relative home study was pending on Franklin's brother. There was no finding regarding the parents' compliance of the parents.

On September 11, the parties appeared for a TPR hearing. However, over the objection of the attorney ad litem, the court continued the hearing due to Franklin's hospitalization. The parties appeared again on December 11, but the court continued the TPR hearing because of the pending out-of-state relative home study. The court discontinued visits between Z.P. and both parents.

On January 8, 2019, the court held a second permanency-planning hearing and continued the goal of adoption, finding that DHS had offered services to support a reasonable-efforts finding. The court relieved Franklin's then attorney, Jerry Jones, and appointed parent counsel to represent him. Additionally, the court again discontinued visits between both parents and Z.P. and set the TPR hearing for February 12 to allow additional time for completion of the pending out-of-state relative home study. On January 10, DHS filed an amended TPR petition, and on February 12, the parties agreed to continue the matter due to the unavailability of a witness.

A TPR hearing was finally held on March 26 (and concluded on April 30), and the circuit court heard from multiple witnesses. The first witness to testify was Dr. George DeRoeck, a psychological examiner who has performed approximately four hundred evaluations for DHS. He was declared an expert in his field. Dr. DeRoeck performed

4

psychological evaluations on both parents in the summer of 2017. Dr. DeRoeck diagnosed Franklin with schizoaffective disorder. He explained that individuals can be "cured" of schizoaffective disorder when "they are maintained on medications." He stated his belief that Franklin had the "potential for remediation[.]" The evaluation results recommended that Franklin receive relationship counseling, medication management, intensive family services, and an individual identified to assist Franklin in taking his medication. Dr. DeRoeck detailed that Franklin would need concrete instructions—like a written chore/expectation chart. He noted that Franklin needed to not only be taught how to do tasks but also needed to be given lessons and written expectations. Dr. DeRoeck believed that DHS needed to ask Franklin's psychiatrist why Franklin was not being prescribed antipsychotic medication. Dr. DeRoeck said there needed to be close monitoring of his stabilization on his medication.

Dr. DeRoeck diagnosed Rachel with intellectual disability of upper-mild type and bipolar disorder with psychotic features as opposed to schizoaffective disorder. He testified that Rachel had disclosed that she was hearing voices and suffering from hallucinations. He stated that "she is not capable of independent parenting. And that as I said, based on lower intellectual development and lack of stability. This is an issue that given the fact that she was on medications including I guess of I-M injections intramuscular. It seemed that she was not very stable." On cross-examination, Dr. DeRoeck admitted he had spent only about two hours with Rachel. Despite Dr. DeRoeck's evaluations being received by the court, he acknowledged that psychological evaluations are only accurate for approximately four to six months. He recognized that his evaluations were no longer current and that updated

5

evaluations would be more reliable, especially considering the hospitalizations that had occurred during the pendency of the case for both Franklin and Rachel.

Tessa Bradley, the family services worker assigned to the case, testified that she did not believe the parents demonstrated enough stability regarding their mental–health issues. She noted concern about the environmental condition of the parents' home. When asked what services she provided to the parents, she testified that DHS offered the family "transportation, visitation, then parenting classes, psych evals, Medicaid for [Z.P.], clothing vouchers, daycare, home visits, drugs screens, [and] counseling." She knew the parents began receiving services at a new counseling provider, but she did not have specific knowledge about their participation or progress. Ms. Bradley testified that she raised her concerns regarding the home-environment issues but acknowledged that DHS did not offer services to assist the parents with those issues. She admitted that she could have helped them clean the home and showed them what to do but did not do so. Ms. Bradley stated that the parents made overall improvements when they received services from "Families" because there were more people in the home. After Families, the parents received services from Mid-South, but Ms. Bradley stated that the Mid-South service provider did not seem compatible with the parents. The parents had since switched to another service provider, Clarity, which Ms. Bradley believed was a good thing in that the new service provider might be more like Families and less like Mid-South, but that it was simply too early to know.

Ms. Bradley testified that Rachel had visited Z.P. when able, making forty-four visits during the case. She further stated that Rachel had been hospitalized for mental–health issues fourteen times during the case but that each hospitalization was voluntary. Ms. Bradley

6

testified that there were some issues with Rachel's home but that most had been corrected. Further, she stated that Rachel had complied with the case plan as much as possible.

On cross-examination, Ms. Bradley confirmed that for the first fourteen to fifteen months of the case, Franklin did not have any inpatient hospitalizations and that later in the case when he did have inpatient stays, most were for one day. Ms. Bradley acknowledged that she did not provide Franklin with written instructions but explained it was due to her belief that Franklin could not read. She later confirmed that she texted with Franklin during the case and that Franklin had stated only that he could not read "very well."

Ms. Bradley also testified that the parents understood when they needed assistance. Other than the housing and mental-health issues previously discussed, she could not tell the court anything they had failed to complete. She acknowledged, however, that counseling was the only element of the case plan that addressed the parents' mental-health issues.

Denise Joslin, a program assistant who worked with the family, testified regarding visitation she had observed between Z.P. and Rachel. She testified about observed visits early in the case and how the parents struggled to care for Z.P. She explained some mental-health irregularities with Rachel but stated that she never felt threatened. Ms. Joslin testified that it was obvious that the parents love Z.P., but that they had a difficult time parenting Z.P. She acknowledged that a visitation setting is not the same thing as parenting your child in your own home. She also confirmed she never assisted the parents in cleaning their home.

Franklin testified, readily admitting he has mental-health issues, but stated that when on the right medication he had been able to maintain mental-health stability for six years. He explained that he loves Z.P., believed he could be a good parent, and knew he could take care of Z.P. He clarified the prior testimony that he can read to a limited extent.

Franklin explained that if Z.P. was returned to his care, he had a support system in place to help with Z.P. if he again required inpatient hospitalization.

Rachel testified, expressing her desire to have Z.P. returned to her care. She acknowledged that she needed help at this moment in her life but that she believed with the correct help she could parent Z.P. She testified that she needed time to find the right medication combination and believed that she finally had reached that point. Rachel expressed a belief that she could work to have an appropriate support plan in place for a caregiver for Z.P. if she required inpatient hospitalization while Z.P. was in her care.

Following this hearing, the court entered an order on May 28, 2019, wherein it terminated Franklin's and Rachel's parental rights to Z.P. The court found that it was in Z.P.'s best interest to terminate their parental rights, and it did so based on the following grounds: "failure to remedy" pursuant to Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)*(a)* (Supp. 2019), and "aggravated-circumstances" pursuant to Arkansas Code Annotated section 9-27-341(b)(3)(B)(ix)*(a)(3)(A)–(B)(i)*. Additionally, the court found Franklin to be a noncredible witness, and specifically found the testimony of Ms. Bradley, Ms. Joslin, and Dr. DeRoeck to be credible. The court also found Rachel to be candid and credible when she discussed her mental-health issues, particularly when she testified about hearing voices.

## II. *Standard of Review and Applicable Law*

We review termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Dade v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 443, 503 S.W.3d 96. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, we have noted that in matters involving the welfare of young children, we will give great weight to the circuit

8

court's personal observations. *Jackson v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 440, 503 S.W.3d 122.

> The termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. *Fox v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 666, 448 S.W.3d 735. As a result, there is a heavy burden placed on the party seeking to terminate the relationship. *Id.* The termination of parental rights is a two-step process that requires the circuit court to find that the parent is unfit, and that termination is in the best interest of the child. *T.J. v. Ark. Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997); *Smith v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 753, 431 S.W.3d 364. The first step requires proof of one or more of the statutory grounds for termination. Ark. Code Ann. § 9-27-341(b)(3)(B). The second step requires consideration of whether the termination of parental rights is in the child's best interest. Ark. Code Ann. § 9-27-341(b)(3)(A).

*Atwood v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 448, at 4–5, 588 S.W.3d 48, 51–52.

### III. *Discussion*

### A. Franklin's Appeal

Although he acknowledges that DHS provided some services, Franklin argues that the evidence was insufficient to support the statutory grounds employed to terminate his parental rights because DHS did not provide sufficient proof that it offered adequate services to the family to support the TPR decision.

To prevail on the failure-to-remedy ground, DHS must demonstrate that (1) the child was adjudicated dependent-neglected; (2) the child remained out of the custody of the parent for twelve months; (3) the parent failed to remedy the cause of the removal; and (4) this failure occurred despite "meaningful efforts" by DHS to rehabilitate the parent and correct the issue that caused the removal. Ark. Code Ann. § 9-27-341(b)(3)(B)(i). Franklin submits that the failure-to-remedy ground has a specific-services element that requires DHS to offer proof that it provided meaningful services to assist the parent in remedying the issues that caused the child's removal.

Likewise, to prevail on the aggravated-circumstances ground that there was little likelihood that services would result in successful reunification, DHS was required to demonstrate that if appropriate reunification services were provided, there was little likelihood that the services could achieve reunification; however, "there must be more than a mere prediction or expectation on the part of the circuit court that reunification services will not result in successful reunification." *See Yarborough v. Ark. Dep't of Human Servs.*, 96 Ark. App. 247, 254, 240 S.W.3d 626, 631 (2006). Franklin submits that a little-likelihood finding must be predicated on something, and this something can be services. *See Duncan v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 489, at 10 (reversing a little-likelihood finding where DHS delayed providing services, and the appellant was compliant and making progress).

Franklin challenges the services element of both grounds supporting TPR. He maintains that DHS failed to present sufficient evidence that it made efforts to provide the necessary services to assist him in remedying the cause of Z.P.'s removal. Likewise, without sufficient evidence with regard to the offer of necessary services to reunify this family, DHS could not possibly prove that an offer of services could not result in successful reunification.

Although Franklin may have raised a services argument at the TPR hearing, he failed to challenge any of the circuit court's prior reasonable-efforts findings, and he failed to request any of the specific services that he now claims were necessary to remedy the cause of removal; therefore, he has waived any services argument on appeal. *E.g.*, *Lancaster v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 557, at 12–13, 566 S.W.3d 484, 492; *Jones-Lee v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 160, at 18–19, 316 S.W.3d 261, 272.

Moreover, a finding of aggravated circumstances does not require evidence of meaningful services, and Ms. Bradley testified that none of the services had resolved the inability to care for Z.P. *Guardado v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 16, 568 S.W.3d 296; *Willis v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 559, 538 S.W.3d 842.

Franklin cites *Yarborough*, *supra*, for the proposition that the circuit court clearly erred in terminating his parental rights under the aggravated-circumstances ground because it was required to make "more than a mere prediction or expectation" that reunification services would not result in a successful reunification. We disagree and hold that *Yarborough* supports the finding of aggravated circumstances because, as in *Yarborough*, there was considerable testimony and other evidence that demonstrated Franklin could not overcome his mental-health issues to appropriately parent Z.P. *Yarborough*, 96 Ark. App. at 254–55, 240 S.W.3d at 631.

## B. Rachel's Appeal

Rachel argues that the court committed reversible error when it terminated her parental rights to Z.P. pursuant to section 9-27-341(b)(3)(B)(i)*(a)*, finding that Z.P. had been adjudicated dependent-neglected by the court and had continued out of Rachel's custody for twelve months, and despite a meaningful effort by DHS to rehabilitate Rachel and correct the conditions that caused removal, those conditions had not been remedied by Rachel. When a child has been in foster care for twelve months or longer, in order to stave off TPR, a parent must make progress to remedy the situation that caused the child to be taken into custody. *Anderson v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 526, 385 S.W.3d 373. Here, Z.P. was taken into DHS's custody because Rachel was hearing voices and was worried that she might harm Z.P. While there is ample evidence in the record that Rachel

11

still suffers from mental illness, including hearing voices, she urges that there is no evidence that she is worried that she might harm Z.P. Rachel maintains that Dr. DeRoeck's testimony was outdated, and no other witness was qualified to comment on her mental state.

Second, Rachel argues that the court erred in finding that, pursuant to section 9-27-341(b)(3)(B)(ix)*(a)(3)(A)–(B)(i)*, she had subjected Z.P. to aggravated circumstances because there is little likelihood that services to the family will result in reunification. She argues that this little-likelihood finding must be based on testimony and evidence presented at the hearing, and while the nature of the finding calls for some necessary speculation, it must be rationally based on evidence presented at the trial.

Rachel likewise cites *Yarborough*, *supra*, in which this court upheld a little likelihood finding because it was supported by "considerable" expert testimony that the mother had deep-seated psychological problems, described by Dr. Deyoub as "very resistant to treatment." 96 Ark. App. at 249, 240 S.W.3d at 626. The problems prevented the appellant from becoming a fit parent in that they caused her to refuse to accept responsibility for her actions and seek inappropriate treatment for the behavior of her children. *Yarborough*, *supra*. Moreover, in that case, because of DHS's long-term involvement with the Yarborough family, the court had before it a record of repeated failures to remedy the problems that had required DHS involvement. *Id*. Here, Rachel reiterates that Dr. DeRoeck merely conducted a psychological evaluation of her nearly two years before the TPR hearing. He acknowledged that his findings in 2017 would not necessarily be accurate in 2019 and that a new assessment should be scheduled. She argues that Dr. DeRoeck did not give the court any foundation to support a little-likelihood finding due to mental-health issues.

12

Rachel submits that a two-year-old psychological evaluation and Ms. Bradley's testimony that services have not yet resulted in reunification should not be enough to support a finding of aggravated circumstances based on little likelihood of success.

We disagree and hold that sufficient evidence supports the order terminating Rachel's parental rights the basis of at least one statutory ground. Rachel essentially asks this court to reweigh the evidence, which we do not do. *Hernandez v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 449, 588 S.W.3d 102. Additionally, she fails to raise an argument concerning the circuit court's best-interest finding; thus, this court is not required to review this finding. Although there was sufficient evidence to support the circuit court's TPR order on every ground pled in DHS's petition, only one ground is necessary for this court to affirm TPR. *Scott v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 347, 552 S.W.3d 463.

We hold that the circuit court did not clearly err in terminating Rachel's parental rights on the basis of the aggravated-circumstances ground. As noted above, the court consistently found that, to meet the goal of reunification, DHS offered the following services throughout the case: transportation, parenting classes, medical services, psychological-valuation referrals, clothing vouchers, visitation, drug screens, home visits, and counseling referrals. Z.P.'s foster parents assisted Rachel with parenting skills, and DHS provided her with hands-on training during visitation, including skills like holding, soothing, diaper changes, and supporting a child's head. Despite Rachel's receiving these services for more than two years, she continued to suffer from mental-health issues and was consistently hospitalized for suicidal ideations and hallucinations. The court discontinued her visits with Z.P. because of this frightening behavior at visits, and she and Franklin continued to be violent toward each other. *See Brandau v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 87, at

13

24–25, 512 S.W.3d 636, 650–51 (affirming TPR under aggravated-circumstances ground because after eighteen months of services, appellant failed to address the "root issue" in the case—mental illness).

Moreover, despite DHS's multiple conversations with Rachel about the environmental conditions of her home, she continued to maintain an inappropriate home that included dog feces; broken glass; trash on the floor; no hot water; an infestation of mice; and an opossum. Ms. Lofton, who supervised the visits, testified that there was never a point in the case that she felt Z.P. could be left alone with the parents and that it should not have taken Rachel so long to learn basic parenting skills.

Despite her argument to the contrary, we hold that *Yarborough* supports the circuit court's finding of aggravated circumstances because, as in *Yarborough*, there was evidence of a long history of Rachel's failure to overcome her mental-health issues to appropriately parent Z.P. *See Yarborough*, 96 Ark. App. at 254–55, 240 S.W.3d at 631. Like the mother in *Yarborough*, Rachel received years of mental-health treatment, and despite that treatment, she admitted at the TPR hearing that she still thinks about harming herself and is too unstable to parent Z.P. The circuit court in *Yarborough* considered caseworker testimony and multiple psychological evaluations—including one over two years old—to support its aggravated-circumstances finding, which this court found sufficient to affirm TPR. *Yarborough*, 96 Ark. App. at 248–55, 254–55, 240 S.W.3d at 627–31.

Accordingly, the circuit court did not commit reversible error by considering Rachel's psychological assessment along with Dr. DeRoeck's and Ms. Bradley's testimony to support its aggravated-circumstances finding. *See also Rossie-Fonner v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 29, 388 S.W.3d 38; *Jones-Lee, supra.* Further, this court has expressly

14

held that an aggravated-circumstances finding may be supported by a caseworker's statement that no additional services could result in a successful reunification, and this was essentially Ms. Bradley's testimony when she stated that the services offered to Rachel were unsuccessful. *E.g.*, *Anderson v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 791, at 10, 387 S.W.3d 311, 317. We hold that the circuit court's little-likelihood finding was not clearly erroneous. *See Parish v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 552, at 10–14, 532 S.W.3d 121, 127–29.

Affirmed.

HARRISON and WHITEAKER, JJ., agree.

*Benjamin Bristow*, for appellant Rachel Peterson.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for appellant Franklin Peterson.

*Ellen K. Howard*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor child.