Cite as 2023 Ark. App. 158

# ARKANSAS COURT OF APPEALS
### DIVISIONS II, III & IV
#### No. CV-22-335

| | |
|---|---|
| SHANE HELMS[1]        APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br>       APPELLEES | **Opinion Delivered** March 15, 2023<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT<br>[NO. 60JV-20-393]<br><br>HONORABLE TJUANA C. BYRD, JUDGE<br><br>AFFIRMED |

## CINDY GRACE THYER, Judge

Shane Helms[1] appeals an order of the Pulaski County Circuit Court terminating his parental rights to his daughter, Minor Child ("MC") (born 04/19/17). On appeal, he argues that there was insufficient evidence offered in support of the statutory grounds for termination and that the circuit court erred in finding that termination was in MC's best interest. We affirm.

### I. *Factual and Procedural Background*

The Arkansas Department of Human Services (DHS) originally removed MC from the custody of her mother, Selena Dusenberry, in April 2020 after MC was left with an inappropriate caretaker. MC was adjudicated dependent-neglected in June 2020 on the bases

---

[1]Helms's name is spelled throughout the pleadings and transcript as both "Helms" and "Helmes."

of neglect, drug exposure, and abandonment.[2] Dusenberry identified Helms as MC's potential father at the probable-cause hearing. Helms, who lives in Iowa, was present for the adjudication hearing and testified he believed himself to be MC's father. As such, in its June 2020 order adjudicating MC dependent-neglected, the circuit court ordered DHS to refer Helms for both a DNA test and an Interstate Compact on the Placement of Children (ICPC) home study.[3]

Because subsequent DNA testing confirmed Helms's paternity, he was adjudicated MC's father in the October 15, 2020 review order. In that order, the court cited testimony from the review hearing indicating that MC was "displaying emotional trauma," did not respond well to new situations, and would frequently cry until she vomited. The court noted that Helms had not seen MC since she was an infant; however, he was in compliance with the case plan and court orders. The court found that DHS had made reasonable efforts to achieve the goal of the case. Based on MC's therapist's recommendation, however, the court determined that Helms could begin visitation with MC only in a therapeutic setting once the therapist had reviewed his mental evaluation. The court confirmed the goal of the case as reunification with parents, with a concurrent goal of permanent custody or

---

[2]A hair-follicle screen was performed on MC in April 2020, and she tested positive for methamphetamine and THC.

[3]Although in this order the court determined that DHS had not made reasonable efforts to prevent removal, that finding was directed toward DHS's involvement with Dusenberry. The court noted that DHS allowed MC to remain in Dusenberry's home, thus exposing her to illegal substances, and offered no services during previous protective-services cases. This was the only time throughout the case that the court did not make a reasonable-efforts finding.

guardianship with a fit and willing relative. Additionally, the court found that DHS had made reasonable efforts to achieve the goal of the case.

The court held its first permanency-planning hearing in April 2021 and entered the ensuing order in June. At this juncture, the court found that the goal of the case should be permanent custody with a fit and willing relative with a concurrent goal of adoption. Citing the testimony of the DCFS supervisor, the court wrote that MC suffered from depression and anxiety and would uncontrollably scream and cry. Although MC was enrolled in occupational, physical, and speech therapy and was taking Lexapro for her symptoms, the court noted MC's regression in therapy. While the court noted DHS's recommendation that MC be placed with Helms, it also acknowledged the agency's concern that he would need support and services in place to care for MC, who suffered from severe emotional issues. The court also stressed the supervisor's testimony that it was "very important that MC be in therapy" and its concern that if MC went to live with Helms in Iowa and Iowa reported that she was not going to therapy, DHS would have to reconsider placement with Helms.

The court also cited Helms's psychiatric evaluation, which indicated that Helms did not have the capability to parent and recommended an alternative placement. Despite the case having been open for more than a year, Helms had not come to Arkansas to visit MC— a fact that concerned the case supervisor—and thus had not witnessed MC's emotional and psychological problems in person. Helms conceded in his testimony that he had not seen

MC in person since August 2017, when she was about six months old.[4] Although video visitation between Helms and MC began in November 2020, that visitation had stopped because of regression in MC's behavior. The supervisor also noted that Helms told MC "too soon" that she was coming to live with him.

The court found that DHS had complied with the case plan and had made reasonable efforts to provide family services. Additionally, the court determined that Helms, "to the extent he can, has complied." The court declined, however, to begin an ICPC placement with Helms because

> the emotional trauma this child has experienced and how she exhibits it is triggered by change. At this point, we don't know what type of therapy there is in Iowa. It is uncertain whether the father has the ability to parent this particular child. There are way too many unknowns and this would be another change in her life. There wouldn't be eyes on her and there are not always updates and that is not a risk the court will take.

The court also discussed Helms's psychological evaluation, which revealed that Helms has a brain injury and "a lower IQ." Significantly, the evaluation concluded that Helms had "the interest but not the capability to parent." The court elaborated on this point as follows:

> [B]ased on the testimony and the findings of the evaluation, support would clearly be needed and it is not clear that at the end of the day that the father can parent this child. The court believes the father's heart is in the right place, but his abilities are clearly challenged. If the foster parent with experience has struggles with MC, there is no special training available and all you can do is take advice, that is an added challenge for Mr. Helms. The father has not experienced MC's behaviors in person to see how he would respond. The court will give Mr. Helms the opportunity to demonstrate what he has learned and provide him the full experience of what MC is dealing with. At the end of the day, this case is to ensure that the health, safety, and welfare of the child is protected, and while the court does not think the father is

---

[4]We observe that MC was nearly four years old by the time of this permanency-planning hearing.

4

dangerous, it is not sure that the father is capable of parenting MC. Mr. Helms's insight and judgment with the child will be an important consideration.

The court ordered DHS to provide Helms with financial assistance to come to Arkansas for an extended period to engage with MC in standard supervised visits. The court also referred MC for a complex-trauma assessment.

The court held a second permanency-planning hearing in July 2021, fifteen months after MC was taken into DHS custody. At that hearing, the caseworker testified that Helms had visited Arkansas for a month and had had about eight in-person, supervised visits with MC. The visits went well, and after Helms returned to Iowa, he and MC had one visit each week via Zoom. Helms testified that he had finished parenting classes, although he did not provide proof of completion. In addition, although he attended some of MC's medical appointments while he was in Arkansas, he could not recall the name of the doctor, the type of doctor, or the name or dosage of medication prescribed for MC.

In this permanency-planning order, the court noted that Helms had been referred for an ICPC study in October 2020, but the ICPC placement could not be completed because Helms's mother, who continued to live with him, had still not completed the necessary background checks despite multiple referrals. The court noted other problems with Helms's mother's involvement, stating that "the court has not seen Mr. Helms's mother on a hearing to tell the court that this is something that she wants to do and her actions do not support it." In changing the goal of the case to adoption, the court expressed very specific concerns:

> It is not fair to MC, who already has huge hurdles to overcome, to continue to have confusion and uncertainty about this phase in her life. Mr. Helms did come to Arkansas for in-person visits. Both Mr. Helms and the worker indicate he

completed parenting. He attended medical visits for his daughter but clearly does not have a reasonable understanding of his daughter's issues based on his testimony. The Court would not normally make so much of it, but this is a special case and if there is a parent who knows how much this child reportedly cries until getting sick, then the parent is to make it their business to understand as much as they can. The Court finds that this is a hard situation because the Court knows Mr. Helms loves his daughter, but he is not capable of caring for her on his own and his support system has not shown herself to be a reliable source of support for this transition or placement.

The court found that DHS had complied with the case plan and had made reasonable efforts to provide family services, such as individual counseling, developmental services, an ICPC home study, and a psychological evaluation.

Following the change of the case goal to adoption, DHS and MC's attorney ad litem filed a joint petition for termination of parental rights on August 13, 2021,[5] alleging two statutory grounds: "subsequent other factors," Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)* (Supp. 2021); and "aggravated circumstances," in the sense that there was little likelihood that further services would result in successful reunification. Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(A)–(B)(i)*. The court appointed counsel for Helms on September 17, 2021, and after granting a continuance at new counsel's request, it scheduled a termination hearing for January 2022.

Following that hearing, the circuit court entered an order terminating Helms's parental rights. After summarizing the testimony, which we address more fully below, the court found that DHS had proved both statutory grounds alleged in the petition and that termination was in MC's best interest. Helms filed a timely notice of appeal and now argues

---

[5]DHS also sought termination of Dusenberry's parental rights. She has not appeared in this case since MC was removed from her custody in April 2020 and is not a party to this appeal.

6

that the circuit court clearly erred in finding that DHS and the ad litem proved the grounds for termination. In addition, he assigns error to the court's best-interest findings.

## II. *Standard of Review*

In order to terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the child, taking into consideration (1) the likelihood the child will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). The order terminating parental rights must also be based on a showing by clear and convincing evidence as to one or more of the grounds for termination listed in section 9-27-341(b)(3)(B).

We review termination-of-parental-rights cases de novo. *Parnell v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 108, at 11–12, 538 S.W.3d 264, 272–73. A circuit court's order terminating parental rights must be based upon findings proved by clear and convincing evidence. *Martin v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 508, 657 S.W.3d 881. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Johnson v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 520, 656 S.W.3d 214. In resolving the clearly erroneous question, we give due regard to the opportunity of the circuit court to judge the credibility of witnesses. *Camarillo-Cox v. Ark. Dep't of Hum. Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005). On appellate review, this court gives a high degree of deference to the circuit court, which is in a far superior position to

7

observe the parties before it. *Id*. Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents, but parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Friend v. Ark. Dep't of Hum. Servs.*, 2009 Ark. App. 606, 344 S.W.3d 670.

III. *Discussion*

A. Statutory Grounds

On appeal, Helms challenges both statutory grounds—subsequent other factors and aggravated circumstances—on which the circuit court relied to terminate his parental rights. Only one ground must be proved to support termination, however. *Reid v. Ark. Dep't of Hum. Servs.*, 2011 Ark. 187, 380 S.W.3d 918. For that reason, we address only the aggravated-circumstances ground. To prevail on the aggravated-circumstances ground that there was little likelihood that services would result in successful reunification, DHS was required to demonstrate that if appropriate reunification services were provided, there was little likelihood that the services could achieve reunification. *Love v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 377, 653 S.W.3d 539; *Yarborough v. Ark. Dep't of Hum. Servs.*, 96 Ark. App. 247, 240 S.W.3d 626 (2006).

The unique and difficult facts of this case compel us to set out the testimony and evidence presented in support of DHS's termination petition in great detail. The first witness at the January 26, 2022 termination hearing was Dr. Sarah Root, through whom DHS introduced a complex-trauma assessment. The assessment indicated that MC had been raised in a "chaotic and unstable environment," having been found alone in an alley with no clothes on. When MC was taken into DHS custody, she tested positive for

methamphetamine and THC. MC reported frequent sadness and would cry uncontrollably when left alone in her room at her foster placement. MC was nonverbal when first placed with her foster mother, but she had been improving since that placement. Nonetheless, she exhibited significant anxiety with new environments or changes to her routine.

Dr. Root's conclusion was that MC was "experiencing significant posttraumatic stress symptoms for her age, including intrusive symptoms, negative alterations in cognition and mood, and alterations in reactivity." On the basis of these symptoms, Dr. Root diagnosed MC with posttraumatic stress disorder. In addition, clinical interviews and caregiver responses suggested that MC exhibited significant difficulty with separation from her caregiver compared with other children her age that negatively affected her general well-being and caused impairment at home and in daycare. The level and consistency of her symptoms and the significant impairment they caused warranted an additional diagnosis of separation anxiety disorder.

Dr. Root produced several recommendations as a result of the complex-trauma assessment. Specifically, she concluded that MC required "sustained and consistent safety, structure, stability, predictability, support, warmth, and nurturance in a living situation in order to provide her with the caregiving environment necessary to resolve her symptoms and reduce the impairment that they cause." Dr. Root further opined that MC would benefit from trauma-focused cognitive behavioral therapy or child-parent psychotherapy. Either therapy would require the routine involvement of both the child and the child's caregiver in order for both "to learn relationship-based techniques that help children process trauma, regulate emotional and behavioral reactions, and build securely attached

9

relationships." In addition, Dr. Root testified that caregiver involvement would be "essential" because MC was not old enough to be able to engage in therapy on her own.

The next witness was Dr. George DeRoeck, who conducted Helms's psychological evaluation in October 2020. Dr. DeRoeck first noted that on the Wechsler Adult Intelligence Scale (WAIS), a cognitive assessment tool that produces an IQ score, Helms's full-scale IQ was 79, which is in the borderline deficient range. That said, however, Dr. DeRoeck noted that Helms's scores reflected a split between his verbal-comprehension scores (which were in the deficient range) and his perceptual-reasoning scores (which were in the high average range), which could be indicative of brain damage. Dr. DeRoeck found this consistent with Helms's reporting that his "mother had 'slipped' when he was a baby causing a head injury to him."

Helms's lower verbal-comprehension scores, in particular, were indicative of neurocognitive deficits. Dr. DeRoeck explained that issues such as these "significantly limit" the ability to "process multiple bits of information concurrently" and to "transfer information from immediate memory to short-term memory." His perceptual-reasoning index scores indicated that he has the capacity for pattern recognition and could process information, but slowly. This meant, for example, that storing information for routine tasks would be favorable, but "new information processing [would be] notably limited."

Dr. DeRoeck also discussed Helms's personality-assessment inventory, opining that based on his scores, he "may have a tendency . . . to overvalue his capabilities, not to ask for assistance and help when help would be necessary or needed." When asked about Helms's ability to parent a child with developmental delays or behavioral issues, Dr.

DeRoeck responded that Helms "would have the willingness and desire to do so but would lack the capability to independently parent. He may feel that he has that capability . . . [but he has a] lack of awareness of some of the difficulties that he's going to have." Ultimately, it was Dr. DeRoeck's recommendation that an "alternate placement" be made for MC. This was based on the significant difficulties Helms would have with independently caring for a young child. These difficulties included the fact that he had lacked involvement with MC since she was eighteen months old;[6] he would have difficulty being involved in family integration therapy; and he would have to be able to understand MC's developmental, emotional, and social needs and provide for her logistically, when he had significant adaptive behavioral deficits himself.

Dr. DeRoeck added that Helms was a poor historian about his own medical condition, which included dyslexia and possibly a seizure disorder. This concerned him because if a parent cannot provide a good personal medical history, there is a risk of poor reporting about a child's condition to medical providers. Such a risk could be exacerbated by his tendency to overvalue his own capabilities and minimize difficulties. In addition, he could have trouble retaining information or communicating, for example, to medical-care providers or school personnel, about difficulties that the child was having.

The next witness was Elizabeth Oldridge, an adoption specialist who ran a data match for MC. In running the match, Oldridge noted that MC has no physical health concerns, but she did note MC's "behavioral and developmental attachment issues," she "displays or

---

[6]By way of contrast, MC had already been in her foster placement for twenty-one months by the time of the termination hearing.

has a history of inappropriate sexual behavior," she "will require counseling," she has "serious emotional disturbances," and she "may require specialized daycare." Despite these issues, the data match still returned 117 possible matches for MC in Arkansas. Oldridge concluded that MC is highly adoptable, and she saw no barriers to her adoption.

The court also heard the testimony of MC's foster mother, Kristina. Kristina said that MC had been placed with her since the case had been opened—approximately twenty-one months. At the time of the termination hearing, MC was receiving 90 minutes of physical therapy, 120 minutes of occupational therapy, and 180 minutes of speech therapy each week. She also received 60 minutes of mental-health and play therapy every other week. Although the therapy had improved MC's symptoms over the last year and she was better able to self-soothe, MC still could get "so worked up that she throws up." MC was taking a 5 mg dose of Lexapro daily, and her therapist was considering increasing the dose to 10 mg. According to Kristina, changes in MC's schedule would trigger her outbursts. For example, not having school on Saturdays and having to go to therapy on Mondays were frequently problematic. When asked on cross-examination if she wanted to adopt MC, Kristina conceded that MC had been her "most difficult placement." She quickly added, however, that "I can't see if she goes up for adoption letting her go somewhere else at this point."

Helms also testified at the hearing. He explained that he works nine to five, Monday through Friday, at a mechanic's shop in Missouri. Helms does not drive but instead relies on the assistance of family for transportation. In addition to his employment, he receives Social Security disability payments because of his learning disabilities. Helms said he had

tried to get custody of MC when she was an infant, but her mother would disappear with the child. Asked what kind of therapy MC was receiving, Helms said "Play therapy, mental––trying to figure out the name of it—mental health, and then I'm pretty sure there is something else." He said she received physical therapy "once a week [for] nine hours" but did not know the frequency of her occupational therapy "because they don't keep me posted and everything where I can have it all written down in my stuff."

Helms recalled attending a doctor's visit during his period of visitation with MC, but he was unable to recall the type of doctor she saw and did not recall her other medications beside "Electric Pro."[7] Asked about MC's complex-trauma assessment, Helms said he had not read it but had his sister-in-law read it to him. Helms was unable to recall MC's mental-health diagnosis.

Helms conceded that he struggled with reading and writing, but he said he was still able to work every today and did well with "hands on" experiences. He explained that his family would assist him if he needed help understanding things, and he was not embarrassed to request assistance. Helms further testified that he had told his caseworker he would like MC to be placed with his family. He specifically mentioned his aunt, Sharon Clevenger, who had previously been married to Helms's mother's brother.[8]

Helms stated that he had been living alone for seven months, but before that, his mother lived with him. He did not have a driver's license but insisted that family members

---

[7]"Electric Pro" was the court reporter's phonetic reproduction of Helms's testimony.

[8]Clevenger was referred to both as "Sharon Clevenger" and "Karen Clevenger" throughout the hearing; however, she identified herself as "Sharon Lynn Clevenger" during her testimony.

could assist him with transportation required to meet MC's health needs. He asserted that he had attended parenting classes and had learned a great deal about caring for children, including safety measures. He also attended some therapy sessions in which he learned to pay attention to things that might trigger a child. He said that his visits with MC were going well, although she would sometimes want to cut them short because she was tired. Helms denied that his parental rights should be terminated, asserting that MC could be placed with his aunt Sharon Clevenger, who would provide a safe and loving home.

Helms acknowledged that while he has his own bank account, his mother was currently the payee on his disability payment. When asked why he had not obtained a driver's license during the pendency of the case, he explained that he was "more worried about my daughter than getting a license right away." He conceded that he had some memory problems, but he denied that he would have any difficulty taking care of MC's doctor's appointments or schooling issues, saying that he had "good support" who were there to help him if he didn't remember things.

Finally, caseworker Christy Bell testified on behalf of the petitioners. After noting that Helms had lived in Iowa throughout the case, Bell described the services that he had completed: parenting classes, the psychological evaluation, a hair-follicle test, and visitation via Zoom. According to the ICPC that had been updated in March 2021, Helms lived alone with no one in the house to assist him with caring for MC. This concerned Bell because his diagnosis and assessment results indicated that he was not able to care for himself without assistance, let alone a child. She agreed with the conclusion of the psychological evaluation that he would have significant difficulty with the concept of independent childcare. Based

on the combination of MC's "delays and challenges" and Helms's limitations, Bell did not believe that MC could be safely placed in Helms's custody. Specifically, she noted that she had safety concerns because of his inability to recall and follow through with MC's needs; in addition, his lack of a driver's license meant he could not "take her where she needs to go . . . in the event of an emergency." Given MC's delays and emotional issues, Bell believed that adoption was the best permanency option for her and that termination of Helms's parental rights was in MC's best interest.

Bell further noted that an ICPC study had been conducted and approved for Sharon Clevenger. She agreed that DHS could consider adoption of MC by Clevenger, but placing the child with her father still would not be in her best interest. Upon further questioning by DHS, Bell noted that, although the home study had been approved, because of MC's conditions and concerns, she would need to form a bond with Clevenger, and Clevenger would need to be fully informed about all of MC's special needs. Despite that, however, Clevenger had never called to inquire about MC's needs or to ask about finding appropriate therapists where she lived. If MC were to be placed with Clevenger, there would have to be a slow transition process to ensure MC's comfort with the process.

At the conclusion of the termination hearing, the court found that, although Helms had completed the services provided by DHS, there was no evidence that he had benefited from those services to the extent that he was capable of providing the high level of care that would be required to take care of MC on his own. The court also stated that there were no additional services "that could get him there." In the termination order, the court explained further, writing as follows:

[T]he father has been offered and has completed the services referred for him. He has visited regularly with his child and those visits have gone very well. However, the psychological evaluation performed by Dr. DeRoeck, as well as Mr. Helms's own testimony, establish what the Court has previously found in that his intellectual functioning, his challenges with comprehension and focus, make him incapable of caring for his daughter on his own. The Court finds Mr. Helms credible. His testimony today and throughout this case has been credible. That is not the issue. Mr. Helms has never had to care for the child on his own and has limitations. Prior to today, this Court has not seen or heard from any potential source of support to him. This Court's opinion has not changed in regard to Mr. Helms's challenges and inability to provide independent care for MC. This case is unique, in that MC is four (4) years old and has already completed a complex trauma assessment and has been diagnosed with PTSD and separation anxiety disorder, which cause her to exhibit extreme emotional outbursts resulting in hours of crying that sometimes result in her vomiting, or other physical complications. She also suffers from developmental delays, all of which require medication and a significant amount of physical, occupational, speech and play therapy to address her issues. She is finally showing some progress in self-soothing, but still exhibits significant emotional challenges with change. The testimony is that Mondays and Saturdays are difficult because of schedule changes. She does not handle transitions well at all. . . . The father is well meaning but is not able to meet MC's needs.

The circuit court concluded that "[w]hile Mr. Helms has completed all services offered, there are no additional services that would render him capable of providing the high level of care that would be required for MC, so there is little likelihood of reunification in a timeframe consistent with the developmental needs of the juvenile."

Helms challenges the circuit court's aggravated-circumstances finding, arguing that he fully complied with the case plan and court orders throughout the case and suggesting that DHS failed to prove that it offered appropriate services "to see how [he] could parent outside of a restricted and supervised setting." It is true that this court has stated that "there must be more than a mere prediction or expectation on the part of the circuit court that reunification services will not result in successful reunification." *Yarborough*, 96 Ark. App. at 254, 240 S.W.3d at 631. A finding of aggravated circumstances, however, does not require

evidence of meaningful services. *See Peterson v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 75, 595 S.W.3d 38.

On appeal, Helms does not identify any other service that DHS could have provided to make reunification likely. Instead, he asks us to weigh the evidence differently than the circuit court did. This court is ill-suited for such a task. *See Peterson*, *supra*. The evidence here demonstrates that throughout the case, DHS provided Helms with multiple services. The evidence also showed, however, that Helms did not know the names of MC's physicians, what she was being treated for, or the dosage of her medications. He did not have a driver's license to be able to transport her to her multiple therapy appointments. As the court noted, MC was diagnosed with PTSD and separation anxiety disorder; suffered from extreme emotional outbursts; and required extensive physical, occupational, speech, and play therapy to address her psychological and physical issues. Caseworker Bell testified that she did not believe that MC could be safely placed in Helms's custody because of the combination of MC's "delays and challenges" and Helms's limitations. Thus, despite these services, Helms remained incapable of safely and independently providing for MC's very specialized needs.

In our de novo review of the evidence, we cannot say that the circuit court erred in concluding that there was little likelihood that services would result in successful reunification. Accordingly, we affirm the circuit court's aggravated-circumstances finding.[9]

---

[9]To the extent that Helms argues that he was not appointed an attorney sufficiently early in the proceedings, this argument is not preserved for appeal because he failed to raise the argument below. *See Ussery v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 250, 646 S.W.3d 266. Moreover, he was appointed counsel several months before the termination hearing. This court has noted that there is "authority for the proposition that any 'failure'

B.  Best Interest

In his second point on appeal, Helms argues that the circuit court erred in finding that termination was in MC's best interest. As noted above, in order to terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the child, taking into consideration (1) the likelihood the child will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii); *Martin v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 508, 657 S.W.3d 881. Each factor does not have to be proved by clear and convincing evidence; rather, it is the overall evidence that must demonstrate clearly and convincingly that termination is in the child's best interest. *Rogers v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 417, at 8, 654 S.W.3d 706, 711.

Here, in conducting its best-interest analysis, the court cited the testimony of adoption specialist Oldridge in finding that MC is adoptable.[10] As to potential harm, the

---

to appoint counsel at early stages of the dependency-neglect process is harmless if the parent has an attorney prior to the termination hearing." *Chaffin v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 522, at 8–9, 471 S.W.3d 251, 257 (citing *Briscoe v. State*, 323 Ark. 4, 912 S.W.2d 425 (1996); *Jefferson v. Ark. Dep't of Hum. Servs.*, 356 Ark. 647, 158 S.W.3d 129 (2004)).

[10]On appeal, Helms does not challenge the circuit court's finding that MC is adoptable; as such, we do not need to address it herein. *See Kilpatrick v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 342, 602 S.W.3d 777. To the extent that we might consider the issue, however, we have held that the testimony of an adoption specialist that a child is adoptable is sufficient to support a circuit court's adoptability finding. *See Viele v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 430; *Cole v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 121, 543 S.W.3d 540.

court found the risk of such if MC were placed in Helms's custody "as there is risk of neglect due to her father's intellectual disability."

On appeal, Helms challenges the court's best-interest findings in two respects. First, he argues that the court should have given more consideration to his aunt, Sharon Clevenger, as a less restrictive alternative placement. Second, he contends that the court's potential-harm analysis was flawed. We address his arguments pertaining to Clevenger first.

Clevenger's first appearance in this case came at the termination hearing. She testified that Helms's mother had been married to her brother, stating that although they were not related by blood, she always considered Helms to be her nephew. She lives in Mercer, Missouri, about four miles away from Helms, and sees him about two or three times a week. She expressed wanting to have guardianship of MC because she "belongs with family." If she were able to obtain a guardianship, she believed Helms should be able to remain in MC's life and keep a bond with her. She said she could provide a safe and appropriate home for MC, noting her medical background and her work with developmentally disabled adults. She claimed to understand MC's PTSD and anxiety diagnoses and was willing to work with and follow the recommendations of MC's doctors and therapists to make sure she gets the help she needs. However, although the case had begun in April 2020, she did not reach out to contact anyone until May or June 2021, and that had been a caseworker in Missouri. Clevenger conceded that she had had only minimal contact with anyone from DHS in Arkansas.

On cross-examination, Clevenger acknowledged that she had only seen MC when she was a baby and did not have a relationship with her before MC was taken into foster

19

care. She added that she did not want to see Helms lose his parental rights because if anything happened to her, he would be able to take care of her. When asked if Helms had shared MC's developmental evaluations with her, Clevenger said he had not discussed it with her in depth "because of the HIPAA," but she knew that she was "not up to where normal kids are at her age." She further agreed that she had only seen MC about three times on Zoom but said she always appeared to be a happy little girl.

In addition to Clevenger's testimony, Helms presented the testimony of Rebecca Shields, who conducted an ICPC home study on Clevenger for the state of Missouri at DHS's request. Shields testified that while the study determined that Clevenger's home was approved for placement, it was not designed to indicate whether Clevenger was capable of meeting MC's special developmental or emotional needs or that it was in MC's best interest to be placed there. Significantly, the ICPC study itself was never introduced into evidence at the termination hearing.

Regarding the possibility of placing MC with Clevenger, the court found as follows:

> The Court heard information about Ms. Clevenger's ICPC today, but the Court has not seen the home study. Ms. Clevenger is, at best, fictive kin, but the Court cannot place the child with her today because there is no approved home study which would provide a basis to do so. While they are not blood relatives, the Court accepts the fictive kin connection, but must note that neither she, nor any mentioned family member, has a relationship with this child, as today's testimony is that no one has seen her since she was a baby. It is also concerning to the Court that Ms. Clevenger suggested that, if something happened to her, Mr. Helms would be nearby to care for her or to take the child to medical and therapy appointments, which indicates a lack of insight into his capabilities and the seriousness of the juvenile's diagnoses.

The court expressly noted, however, that "[n]othing in this order prevents the Department from considering Ms. Clevenger or any other suitable family member for adoption of the child."

On appeal, Helms argues that the court erred in rejecting the option of placing MC with Clevenger because doing so would have been a less restrictive placement option than the severing of his bond with MC. He concedes that Clevenger is not MC's blood relative but argues that she should have been given more consideration as fictive kin.[11]

Regardless of Clevenger's status as fictive kin, however, we cannot find merit in Helms's argument. In short, we agree with the court's conclusion that MC could not be placed with Clevenger for several reasons. First, there was no approved home study. Under the ICPC, a child "shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child." Ark. Code Ann. § 9-29-201 art. III(d) (Repl. 2022). Although Clevenger and Fields testified that an ICPC study had been completed, no such study was introduced into evidence at the termination hearing.

We also agree with the court's concerns over the lack of relationship between Clevenger and MC. Throughout this case, MC was never placed in a relative's custody. Although Clevenger said she "absolutely fell in love with" MC when she saw her as an

_____

[11]Fictive kin is defined in Arkansas Code Annotated section 9-28-108(a)(1) (Repl. 2020) as a person selected by the Division of Children and Family Services who is not related to a child by blood or marriage and has a strong, positive, and emotional tie or role in the child's life of the child's parent's life, if the child is an infant.

infant, as noted above, she had only seen her on three occasions since then and had not expressed an interest in the case until long after DHS had taken MC into care. *See Blankenship v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 63, ___ S.W.3d ___ (affirming circuit court's finding that termination was in the child's best interest when the child had never been in the relative's custody and there was no demonstration of a bond with the relative); *King v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 126, 620 S.W.3d 529 (affirming termination of mother's parental rights when grandmother was effectively a stranger to the child, the child had profound special needs, and there was no demonstration of a strong bond with the grandmother).

Finally, Helms challenges the circuit court's findings regarding potential harm. To find potential harm, "the trial court is not required to find that actual harm would result or to affirmatively identify a potential harm." *Thompson v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 478, at 9, 655 S.W.3d 874, 879. Potential harm must be viewed in a forward-looking manner and considered in broad terms. *Dowdy v. Ark. Dep't of Hum. Servs.*, 2009 Ark. App. 180, 314 S.W.3d 722. Additionally, the same evidence that supports an aggravated-circumstances finding may also support a potential-harm finding. *Thompson*, 2022 Ark. App. 478, at 9, 655 S.W.3d at 879–80 (affirming circuit court's potential-harm finding "based on the same evidence that supports the circuit court's aggravated-circumstances ground" without re-elaborating on the evidence).

In addressing MC's best interest, the court found as follows:

> Ultimately, the Court must decide this matter based on the best interest of the child. MC is a special needs child with severe emotional episodes triggered by the mere changing of her daily schedule. Her father is low functioning, yet she needs a high level of care. In the permanency planning order, the Court found that it did

not make sense to think that MC could start therapy here and then switch to another therapist, when it is clear she does not handle transitions well. Nothing about that has changed. Any transition would have to be incredibly slow, as the therapy addressing the trauma she has already experienced is still in play, and then she would have to be prepared for yet another transition and the fallout from that. If she did not have such unique needs, any transition would likely take some time and would be a challenge. However, this is an extremely unique case, and the child has already experienced a great deal of trauma, though not by Mr. Helms. She is suffering nonetheless, and the law requires that the Court do what it believes to be in her best interest and for her to achieve permanency.

We simply cannot disagree with the circuit court's assessment. This is indeed a factually unique case, and while we may sympathize with Helms, our standard of review is clear. We are not to act as a "super fact-finder," substituting our own judgment for that of the circuit court; we reverse only in those cases in which a definite mistake has occurred. *Black v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 518, at 6, 565 S.W.3d 518, 522; *Harris v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 508, 470 S.W.3d 316. Moreover, even though Helms may have complied with the case plan, we have consistently held that parental rights will not be enforced to the detriment of a child's health and well-being. *Weathers v. Ark. Dep't of Hum. Servs.*, 2014 Ark. App. 142, 433 S.W.3d 271.

Finally, although parents have a fundamental constitutional right to direct the care and upbringing of their children, the State of Arkansas has an equally compelling interest in the protection of its children. *Porter v. Ark. Dep't of Hum. Servs.*, 374 Ark. 177, 185, 286 S.W.3d 686, 694 (2008) (citing Ark. Code Ann. § 9-27-102 (Repl. 2020). Parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *J.T. v. Ark. Dep't of Hum. Servs.*, 329 Ark. 243, 248, 947 S.W.2d 761, 763 (1997). It is important to recall the purpose of the termination-of-parental-rights statutes, which is set forth in Ark. Code Ann. § 9-27-341(a)(3) (Supp. 2021) as follows:

23

The intent of this section is to provide permanency in a juvenile's life in all instances where the return of a juvenile to the family home is contrary to the juvenile's health, safety, or welfare and it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time, as viewed from the juvenile's perspective.

In this case, MC has been out of the family home since April 2020—a time span now closing in on three years, or half of her life. Despite Helms's obvious best intentions, it was clear to the circuit court from the evidence before it that placing MC in his custody was contrary to her health and welfare. Given the very specific circumstances of this case, we simply cannot say that the circuit court erred in finding that termination of Helms's parental rights was in MC's best interest. Accordingly, we affirm.

Affirmed.

VIRDEN, GLADWIN, KLAPPENBACH, and GRUBER, JJ., agree.

HARRISON, C.J., and BARRETT, HIXSON, and MURPHY, JJ., dissent.

**BRANDON J. HARRISON, Chief Judge, dissenting**. I respectfully dissent from the majority's opinion. In my view, the circuit court clearly erred when it terminated Shane Helmes's parental rights on the record presented. Consequently, I would reverse the order terminating Shane's parental rights and remand for further proceedings.

BARRETT, HIXSON, and MURPHY, JJ., join.

**KENNETH S. HIXSON, Judge, dissenting**. Appellant Shane Helmes[1] argues that the circuit court erred in terminating his parental rights to his minor child (MC) because (1) there was insufficient evidence supporting the grounds asserted in the petition to terminate

_____

[1]Our record shows the spelling of appellant's last name at times as Helms and at other times as Helmes.

parental rights, and (2) there was insufficient evidence that termination was in the best interest of his child. I agree and would reverse and remand for further proceedings because termination is premature at this juncture.

Our appellate courts have often stated that in cases involving the termination of parental rights, there is a heavy burden placed upon the party seeking to terminate the relationship. *Lewis v. Ark. Dep't of Hum. Servs.*, 364 Ark. 243, 217 S.W.3d 788 (2005); *Jones v. Ark. Dep't of Hum. Servs.*, 361 Ark. 164, 205 S.W.3d 778 (2005); *Borah v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 491, 612 S.W.3d 749. This is because termination of parental rights is an extreme remedy in derogation of the natural rights of the parents. *Lewis, supra.* Nevertheless, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Id.* Parental rights must give way to the best interest of the child when the natural parents seriously fail to provide reasonable care for their minor children. *Id.* An overwhelming majority of the termination cases that come before this court involve parents who could not sustain efforts to remedy those problems that caused the Arkansas Department of Human Services (DHS) to be involved in their cases or parents who manifest extreme indifference to the health, safety, and welfare of their children until the termination of their rights becomes imminent. *Benedict v. Ark. Dep't of Hum. Servs.*, 96 Ark. App. 395, 242 S.W.3d 305 (2006).

Here, Helmes does not fit into any of these categories. This is not a case in which Helmes seriously failed to provide reasonable care for his daughter; could not sustain efforts to remedy the problems that caused DHS to be involved; or manifested an extreme indifference to the health, safety, and welfare of his daughter. Helmes was not even given

25

the opportunity to care for his daughter. Instead, the circuit court determined that statutory grounds existed; specifically, that other factors or issues had arisen after the original petition was filed, and that there was little likelihood that further services would result in successful reunification. *See* Ark. Code Ann. § 9-27-341(b)(3)(B) (Supp. 2021). It was further determined that termination of Helmes's parental rights was in the best interest of MC.

But one must ask the question why. A brief history is necessary. MC did not lose her father because he was using drugs, abusive, neglectful, or incarcerated. In fact, MC was removed from her mother's custody on April 23, 2020, and at that time, another man was identified as MC's putative father. It was not until the probable-cause hearing that MC's mother testified that another man could be MC's father. Helmes first appeared at the adjudication hearing and subsequently underwent DNA testing to confirm his paternity. Therefore, Helmes was not found to be MC's father and added to the caption of the case until a review order was filed on October 15, 2020. Helmes lived in Iowa; MC's mother, Selena Dusenbery, lived in Arkansas. Helmes explained that MC's mother took MC out of state to prevent him from seeing MC and that he had tried to find MC after she left to no avail.

There was conflicting testimony as to whether Helmes could sufficiently care for himself, much less a daughter with unique needs. Dr. George DeRoeck diagnosed appellant with major neurocognitive disorder due to a head injury. At the start of Helmes's involvement in this case, Helmes's mother lived with him; yet, at the time of the termination hearing, he lived by himself and had been gainfully employed for some time. He had come to Arkansas and stayed near MC for approximately a month where he was able to have eight

26

in-person, supervised visits with her and attend appointments. There was no conflict in the testimony that Helmes and his daughter had bonded, that she loves her father, and that he loves her and wants to be reunited with her. The caseworker even testified that MC would be sad if she were no longer able to see her father. She further testified that Helmes completed parenting classes, a psychological evaluation, and a hair-follicle test. She also testified that Helmes was consistent with his visits and that the visits went well. Moreover, although DeRoeck expressed concerns with Helmes's ability to care for MC on his own, he testified that Helmes would have the ability to aid in the care of his daughter if an alternative placement were made.

The majority concludes that the evidence supports the circuit court's finding that Helmes had not benefited from the services provided "to the extent that he was capable of providing the high level of care that would be required to take care of MC on his own" and that "there were no additional services 'that could get him there.'" Neither ground asserted in the petition requires Helmes to be able to care for his daughter "on his own" without any assistance. The majority stresses that Helmes did not have a driver's license, and upon questioning, he could not recall the names of MC's medications. Helmes did state, however, that his daughter's medication information was written down at home, and he had forgotten to bring the list. The caseworker testified that she believed MC could not be safely placed with Helmes because he is unable to remember things and cannot drive MC in the event of an emergency. However, as I read the statute, nothing requires a parent to have a stellar memory or a driver's license.

Arkansas Code Annotated section 9–27–341(b)(3)(B) defines the two grounds alleged and found by the circuit court as follows:

(vii)(a) That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.

(b) The department shall make reasonable accommodations in accordance with the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., to parents with disabilities in order to allow them meaningful access to reunification and family preservation services.[2]

(c) For purposes of this subdivision (b)(3)(B)(vii), the inability or incapacity to remedy or rehabilitate includes, but is not limited to, mental illness, emotional illness, or mental deficiencies;

. . . .

(ix)*(a)* The parent is found by a court of competent jurisdiction, including the circuit court juvenile division, to:

. . . .

(3)(A) Have subjected any juvenile to aggravated circumstances.

(B) "Aggravated circumstances" means:

(i) A juvenile has been abandoned, chronically abused, subjected to extreme or repeated cruelty, sexually abused, or a determination has been or is made by a judge that there is little likelihood that services to the family will result in successful reunification[.]

---

[2]While we must interpret the statutes as written, it seems to be either curious or an oversight that the legislature found that federally mandated reasonable accommodations apply only to the other-subsequent-factors ground. It is difficult to imagine why reasonable accommodations should not be available in cases relying upon grounds other than other subsequent factors as a safeguard against the derogation of a natural and constitutional right of a parent and child to be together.

28

I acknowledge that only one ground is necessary to support termination. *See Reid v. Ark. Dep't of Hum. Servs.*, 2011 Ark. 187, 380 S.W.3d 918. However, I disagree that there was clear and convincing evidence here to support the grounds alleged nor do I think termination was in MC's best interest.

Therefore, I must go back to my initial question. Why were Helmes's parental rights terminated? The record indicates that he satisfactorily completed each task required of him by DHS. The reason why can be explained only by the fact that Helmes's IQ on the Wechsler Adult Intelligence Scale is 79, which is in the borderline-deficient range, and he was left to navigate much of this case on his own until he was finally appointed counsel just a few short months before the termination hearing and after the circuit court had already determined that the goal should be changed to adoption. He needed a notebook to jot down MC's prescriptions or doctor appointments because he knew he had trouble remembering. The use of a notebook is certainly reasonable, and many parents, regardless of the Wechsler Adult Intelligence Scale, use various calendaring techniques or notebooks to aid them in caring for their children. The majority also notes and faults Helmes for his inability to recall his daughter's medications from memory other than Lexapro, calling it "Electric Pro." At least that was the court reporter's phonetic reproduction of Helmes's testimony. From the record, we do not know if it was Helmes's mispronunciation of Lexapro or the court reporter's unfamiliarity with the prescription drug.

Further, the decision to terminate Helmes's parental rights was made even after a family member[3] had expressed an interest in obtaining custody of MC or even adopting MC as a less restrictive alternative if MC could not be reunited with her father. Sharon Clevenger even had an approved home study of her home in Missouri and was in the process of receiving a determination from the State of Arkansas with the completed home study. As such, it was premature to grant termination given Dr. DeRoeck's testimony that Helmes is able to aid in MC's care if an alternative placement were made. The majority opinion quotes from the termination order that "[n]othing in this order prevents the Department from considering Ms. Clevenger or any other suitable family member for adoption of the child." However, this ignores the fact that Sharon Clevenger and any other family members are not parties to this case and would have no standing to intervene as a matter of right in a subsequent adoption proceeding should the termination be affirmed. *Clark v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 223, 575 S.W.3d 578. Further, even if they could be part of the case in its posttermination phase, no relative preference is given over foster parents under this court's case law. *Id.*

For these reasons, I cannot agree with the circuit court's decision and am left with a definite and firm conviction that a mistake has been made here. "A termination of parental rights is both total and irrevocable. . . . [I]t leaves the parent with no right to visit or communicate with the child, to participate in, or even to know about, any important decision affecting the child's religious, educational, emotional, or physical development."

---

[3]Sharon Clevenger had previously been married to Helmes's mother's brother. Therefore, while it is undisputed that Sharon is not a blood relative, the circuit court did recognize her as "fictive kin."

*Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, at 39 (Blackmun, J., dissenting) (footnote citation omitted); *see also* Ark. Code Ann. § 9-27-341(c)(1). Based on the record before us in this case, I must respectfully dissent.

BARRETT and MURPHY, JJ., join.

**MIKE MURPHY, Judge, dissenting**. I join the dissent but write separately to amplify the concerns set out in footnote two. As stated above, the "subsequent factors" ground requires that the department make reasonable accommodations in accordance with the ADA to parents with disabilities "in order to allow them meaningful access to reunification and family preservation services." The "aggravated circumstances" ground, which the court relied on, also requires "services to the family" yet has no requirement to give a reasonable accommodation to a qualifying parent with disabilities. If a parent with disabilities needs a reasonable accommodation to have meaningful access to family services, should not such a reasonable accommodation be given to a qualifying parent where a court is trying to determine if such services will result in successful reunification? This oversight demands legislative clarification.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for appellant.

*Demarcus D. Tave*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Janet Lawrence*, attorney ad litem for minor children.